### JOHN BORDEAUX v. THE STATE.

No. 18.   Decided June 2, 1909.

Rehearing denied January 26, 1910.

**1.—Murder—Charge of Court—Abandonment of Difficulty.**

Where, upon trial for murder, the evidence raised the issue of abandonment of the difficulty by the deceased, there was no error in the court's charge that, if the deceased abandoned the difficulty, and defendant was in no danger of violence from the deceased, and was aware of this, and that he then shot and killed him, he could not justify himself on the ground of self-defense when this charge is construed with other parts of the charge; and there was no reversible error in the court's language as to the good faith of the deceased in the connection it was used.

**2.—Same—Charge of Court—Mutual Combat—Self-Defense.**

Upon trial for murder, where the evidence raised the issue of mutual combat, there was no error in the court's charge that, if defendant intentionally entered into a personal combat with the deceased, intending at the time to use a deadly weapon upon him, and pursuant to such intent shot and killed deceased, he could not justify such killing on the ground of self-defense, considering such charge in the light of the entire charge.

**3.—Same—Charge of Court—Provoking Difficulty—Self-Defense.**

Where, upon trial for murder, the evidence raised the issue of provoking the difficulty, there was no error in the court's charge that, if the defendant intentionally invited or renewed the difficulty with the deceased, intending to slay him with a deadly weapon, and did kill him, that he could not justify such killing on the ground of self-defense, construing this charge in the light of the entire charge.

**4.—Same—Charge of Court—Burden of Proof.**

See opinion for the charges of the court on the issues of abandoning the difficulty, provoking the difficulty, and mutual combat, in which the court did not shift the burden of proof from the State to the defendant.

**5.—Same—Charge of Court—Manslaughter.**

See opinion for charge of court on manslaughter, which did not require the jury to believe, beyond a reasonable doubt, all the facts necessary to reduce the homicide to manslaughter, before they could reduce the grade of the offense.

**6.—Same—Evidence—Ill-Will.**

Upon trial for murder, where the court had admitted in evidence the ill-feeling between the parties at the time of the homicide, there was no error in excluding the details of former troubles or ill-feeling that were not explanatory of or cast any light on the transaction immediately connected with the homicide.

Appeal from the District Court of Eastland. Tried below before the Hon. J. H. Calhoun.

Appeal from a conviction of manslaughter; penalty, two and one-half years imprisonment in the penitentiary.

The opinion states the case.

*D. G. Hunt* and *Earl Conner,* for appellant.—We submit that taking the charge of the court as a whole, and construing the same in connection with the facts as testified to by the witnesses, the defendant has been deprived of the right of self-defense in this: that while the court attempts to charge on self-defense, yet the effect of such charge has been destroyed by the frequent limitations of the defendant's right to act in self-defense, when no such limitations are made, or can be found in this entire record. We submit further that the act of the court in repeating the limitations on the defendant's right to act in self-defense was highly calculated to impress the jury with the belief that in the mind of the court the defendant did not act in self-defense. Tollett v. State, 55 S. W. Rep., 573; Drake v. State, 8 Texas Ct. Rep., 645; Drake v. State, 45 Texas Crim. Rep., 273, 10 Texas Ct. Rep., 584; McCandless v. State, 42 Texas Crim. Rep., 58; Huddleston v. State, 54 Texas Crim. Rep., 93, 112 S. W. Rep., 64. On question of excluding conversation showing ill-will of deceased towards the defendant: Holley v. State, 46 S. W. Rep., 39.

*F. J. McCord,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—Appellant was indicted in the District Court of Eastland County charged with the murder of one Hiram McCleskey, alleged to have been committed on the 4th day of December, 1907. He was put upon his trial at the January term of the District Court of said county, and was on February 10, 1908, convicted of the crime of manslaughter and his punishment assessed at confinement in the penitentiary for a term of two and a half years.

The appellant and the deceased were both farmers, living some five miles from the town of Eastland. Their relations had not been very friendly for something like two years, although there had been no open rupture, and the ground of the unpleasantness between them was not very substantial. On the day of the homicide appellant left

his house with a load of seed cotton en route to the town of Eastland. On the same day the deceased, McCleskey, was returning from Eastland and they met in the public road about eighty yards south of the residence of one J. J. Frost. The deceased when found was in a country road about thirty-seven steps from where the wagons were, injured by a shot which entered behind about two inches from the backbone and which had passed entirely through him in a slightly upward range. A part of the difficulty was seen by two ladies, Mrs. J. J. Frost and her daughter-in-law, Mrs. Fannie Frost. The last named witness saw most of the difficulty. She states that when she first saw the parties they were in the road directly south of the house; that she did not then recognize them, but heard some very rough language used; that one of them told the other to get out of the wagon, and that he would whip him; that she thought this was the man who was going towards Gunsight, which from the position of both parties would mean deceased; that both men got off of their wagons and one asked the other how he wanted to fight; that she did not hear any reply, but they started to fight and one of them knocked the other down; that the man coming down the road towards Eastland was knocked down. This from the position of the parties would mean appellant, and the other man seemed like he was stamping the one knocked down; that one of them asked the other if he was satisfied; that she heard no reply to this, but the man who was down got up and that she then went to the place where her mother-in-law was washing; that the men then talked together and one of them threw out some rough language; that she thought it was the man going towards Gunsight; that he told the other that he would not allow him to call him any such; that thereupon deceased went towards appellant, who drew a pistol, when deceased asked him not to do that because he did not have any gun, and that the man with the pistol fired; that she immediately ran towards where her husband and other members of the family were working in the field; that there was another shot fired, but she did not see the parties at the time. The testimony of Mrs. J. J. Frost in a general way supports that of her daughter-in-law, Mrs. Fannie Frost, except that she states that after the pistol was fired the deceased ran behind his wagon, stooped down and then raised up and then made a motion as if he was throwing. She did not see the second shot fired. The State also introduced J. J. Frost, who at the time of the homicide was some two or three hundred yards in the field. He went also immediately to where deceased was and found him thirty-seven steps, nearly south of the place where the wagons had been stopped, and about ten yards from a pool of water between a neighborhood road and the creek. His testimony touching the whereabouts of deceased and his statement is as follows: "He was about ten yards from a pool of water and between a neighborhood road and the creek—this road entered the public road where the wagons were

standing. When I found him he seemed to be suffering greatly. I think he was shot in the back through the hip bone, and the bullet came out in front a little to the left on the other side. I afterwards saw the wounds on the body of deceased. When I got to the wagons on my way to McCleskey, both wagons and teams had turned outside of the roadway towards the south. Mr. Bordeaux's wagon was pointed in a southerly direction and had no team hitched, and Mr. McCleskey's team was headed in a southwesterly direction. My recollection is that Mr. Bordeaux's wagon was almost opposite Mr. McCleskey's wagon and team. Mr. Bordeaux's team had in turning apparently raised the hind wheel of his wagon six or eight inches from the ground in turning out. Mr. McCleskey had cotton seed on his wagon and Mr. Bordeaux a load of seed cotton on his. I know the character of the road where the wagons met; there was plenty of room for either of them to have passed the other. My recollection is that Mr. McCleskey was traveling slightly uphill. I do not think it was over six minutes from the time of the shooting until I got to McCleskey. I saw no one at or near where the deceased was lying and no one going from that place, and I am sure I was the first one to get to him after the shooting. When I first got to McCleskey, my recollection is, I first asked him how much he was hurt, and he replied that he was so badly hurt that he did not think he would ever get over it. He said Bordeaux had shot him. He said that he was freezing to death. I asked him how he came to be so wet. He said that he had gone into a hole of water to try to stop the blood. He said he was shot right there where I found him, which was about thirty-five yards or more from the public road, and a little west of south from where the wagons were. The pool of water was about ten steps from where he was then lying, just on the other side of a little bank. He said he was running away from Bordeaux trying to get over the bank when Bordeaux shot him. He said he had gone into the pool of water to stop the flow of blood, and had gotten back to where I found him, and had given down and could not get any further. There was blood where he was lying, and blood between him and the pool of water. I asked McCleskey how the difficulty occurred. He said, 'I was coming out from Eastland towards home and met Mr. Bordeaux with a loaded wagon; I pulled out and gave half of the road, but Bordeaux would not give any of the road. I told him that he would have to give part of the road. He cursed me and said, 'I had run over him as long as I was going to.' I told Mr. Bordeaux if he would get off of his wagon that I would give him the worst whipping he ever had in his life in a pair of minutes. We both got off the wagon about the same time and started toward each other. We passed several licks, and I knocked Bordeaux down with my fist, and kicked him and asked him if he had enough. He said that he had or was satisfied. I then started back toward my wagon, and Bordeaux called me a son-of-a-bitch. I turned around

towards him and said that I would not take that.  He pulled his
pistol.  I told him not to shoot, and that I was unarmed.  He shot
at me; I ran around the wagon and picked up a rock and threw it at
him and missed him.  I saw he was going to shoot me.  I ran off
down here thinking that I could get into the creek before he could
shoot me.  When I had got down here he shot the second time and
hit me.'  This conversation all occurred immediately after I got to
the deceased, not more than ten minutes after the shooting.  I think
my son, Dallas Frost, was the next man who came up, then two other
men came along in a mail hack, and together we all carried Mr.
McCleskey to my house.  I could not say how long a time intervened
between the two pistol shots, but it didn't seem very long.  I did not
charge my mind with it at the time and I know of nothing that would
enable me of my own knowledge to give the length of the interval—
there was probably fifteen seconds between the two shots or even more
than that.

"There was considerable blood where I found the deceased lying,
and a trail of blood from where he was lying to that pool of water,
but I could find no other blood anywhere except between where he
was lying and the water.  I made a careful examination for blood
several hours after the shooting of the ground between where the
wagons were standing and where I found the deceased, but I could
find no blood nor trace of blood anywhere around there except where
deceased was lying and between him and the pool of water.

"I have stepped some distances since the examining trial that are
mentioned in the testimony.  It is (82) eighty-two yards from the
porch of the house south to where the wagons were standing.  It is
one hundred (100) yards from the well, or wash place, southwest to
where the wagons were standing at the time of the difficulty.  And
the well is sixty yards east of the porch of the house.  My wife and
daughter-in-law, Fannie, showed me the place they were getting under
the wire fence when the second shot was fired.  That place is thirteen
yards from the well.  The place where the wagons stopped is in plain
view of the dwelling house, and of a person at the well.  There are
only a few trees there.  There is a common wire fence in front of the
dwelling and along the south line of the J. R. Frost farm there.
After the deceased was carried to my house and given some attention,
I designated and pointed out to Dr. Boon, Dr. Downtain, J. W. Steele
and probably other persons the place at which I found the deceased
lying just after he was shot, and they examined the blood spot or
pool of blood where he was lying, and also the trail of blood between
there and the pool of water and looked for blood at other places there."

Perhaps it will aid in understanding the location of the parties by
inserting a map of the roads, house, and especially the place where

deceased lay.  The following is approximately a correct map of the situation:

**PLAT OF THE PLACES NAMED IN EVIDENCE.**
SCALE APPROXIMATELY 100 FT. TO THE IN.

J.J.FROST
& SONS
WORKING

N

**J.R. FROSTS FARM**

S

WIRE FENCE

WIRE FENCE

FARM DWELLING
WHERE J.J.FROST
LIVED

PORCH
60 yds.

WELL

WIRE FENCE

EASTLAND AND GUNSIGHT
PUBLIC ROAD

BRANCH

WAGONS A

PLACE OF DIFFICULTY

PUBLIC ROAD

CREEK

DECEASED LAY

COUNTRY ROAD

POOL OF WATER

There was testimony that there was a trail of blood from the water's edge to the point where deceased was said to have been found after being wounded, but the testimony tended to show there were no blood stains except from where he came out of the water to the place where he was found.  Appellant was shown to have suffered right severe injuries in the encounter.  Dr. Downtain testified that about 11 o'clock on the day in question appellant came to his office in East-

land and he dressed his wounds; that he had blood on his face and upper part of his clothing; that his face was swollen and bruised and one eye was completely closed; that he had a wound on his face and one on his left temple which was cut to the bone and about half an inch long; that his face was bruised and blackened to some extent, but the skin was not otherwise broken. Appellant proved an excellent reputation as a peaceable, law-abiding citizen and a like reputation for truth and veracity by the sheriff, treasurer, tax assessor of the county and several other persons. The testimony also showed that deceased was not as tall as defendant but a little heavier. Appellant became a witness in his own behalf and gave the following account of the difficulty: "My team was a pair of ponies and I could not keep them going, but had to rest them occasionally. Just before I got in front of the Frost home I had to pass through a sand bed, and the rain had made the road bad, the ruts were cut deep; I stopped my team just where the difficulty took place to let them rest. No one was seen by me at the time I stopped. I could probably see one hundred yards southeast along the road towards Eastland; soon after I stopped I noticed a two-horse wagon coming to meet me, but did not notice or recognize who it was. He usually worked a pair of mules, but this team was a mule and a horse and I did not recognize his team at first, but later recognized Mr. McCleskey. He came on to within thirty or forty yards; he commenced saying something. I did not know what he said until he got near. The first words I recognized were he said 'get out of the road.' He was waving his hands and said get out of the road. He drove up nearer and our wagons were in the same wagon ruts. He stopped near me and said, 'you get out' of this road or I will get down and whip you right here in a minute.' I said, 'Well, Mr. McCleskey, there is no use for you to cut up that way; I have not refused to give you the road.' He crawled right off of his wagon, threw off his overcoat and gloves and started towards my wagon where I was seated. He then said, 'I will whip you right here; get down from there.' I got off, and when I got even with my horses he struck me here (indicating over his eye), see the gash here? He knocked me down; knocked me insensible for several minutes, and I did not know anything for several seconds, and when I did know anything he was standing straddle of my back with something in his hand. Then he struck me here (indicating his cheek bone), and he finally stepped off of me and I got up and staggered to my team. My horses had cut out of the road as far as they could turn. I saw how they were and tried to pull them straight; my back was towards Mc-Cleskey; he went on north side of road, the horses were on south side. I said to Mr. McCleskey, 'this is all uncalled for.' He said, 'I see you have not got enough yet; I will finish my job on you,' or something like that. When he said that I turned facing him. He was advancing on me; he had his right hand thrown back. I said, 'McCleskey, you

hold up; I have taken all off you I am going to.' He never stopped. I reached for my revolver and pulled it; he threw a rock at me, and I pulled out the revolver and shot. I shot to keep him off of me. To the best I could tell the revolver fired and the rock was thrown about the same time. I was then ten or twelve feet from him. He was just on the north side of the road and I was on the other. McCleskey's horses and wagon were still in the road, as I remember; he was walking rapidly towards me and was a little above his horses' heads. He then went east on north side of wagon and got behind it, and when he got to the southeast corner he threw another stone at me and I jumped back to the north side and kept the wagon between me and him. He came up to the front wheels and threw across the wagon at me again. He then wheeled in this position like (defendant here indicated), appeared to be reaching for a rock and I fired again. I was twelve or fifteen feet from him just across the road—he on the south and I on the north. He said, 'Don't shoot any more, you have shot me; don't shoot any more.' He kind of laid or fell over and got on his hands; he got up and started south and went a few steps and fell again; he said, 'John, get me some help; phone for a doctor.'"

Responding to this evidence the court gave a charge to the jury in which he submitted to them murder in the first degree, murder in the second degree, manslaughter, self-defense, as well as the law in reference to abandoning the difficulty, provoking the difficulty and mutual combat. The charge of the court in reference to self-defense is not seriously criticised, and was, we think, a fair and liberal presentation of that issue in the case. The charge of the court in respect to the other matters is seriously and vigorously criticised and they are the important matters and questions in the case. These instructions are as follows: "If you find that the deceased used violence upon the defendant and put defendant in fear of his life or serious bodily harm; if you further find that the deceased, Hiram McCleskey, in good faith abandoned said conflict and fled from the defendant, and that the defendant was in no danger of violence then from the deceased, and that the defendant knew the same, and that knowing the same defendant shot and killed the deceased, he can not justify such killing on the ground of self-defense or because he had been assaulted, but the defendant would be guilty of manslaughter or of a higher grade of homicide as herein charged.

"If you believe from the evidence beyond a reasonable doubt that the defendant being armed with a deadly weapon of his own accord, or upon being challenged to a personal combat by the deceased, intentionally entered into a personal combat with the deceased, intending at the time to use said deadly weapon upon the deceased, and that pursuant to such intention after entering said combat he shot and killed the deceased, he can not justify such killing on the ground of self-defense, but he would be guilty of manslaughter or of a higher

grade of homicide, owing to the other facts and circumstances, if any, connected with such killing considered in connection with other parts of this charge defining manslaughter and higher grades of homicide.

"If you believe from the evidence beyond a reasonable doubt that the defendant and the deceased entered into a personal combat or that the deceased assaulted the defendant and that such assault and battery or said personal conflict had ceased and that the defendant knew that such conflict or assault had ceased and that the defendant being then armed with a deadly weapon, and knowing that said assault or combat had been abandoned, if it had been abandoned, he intentionally invited or renewed said difficulty or intentionally entered into a renewal of said conflict armed with such deadly weapon, intending at the time to slay the deceased or to do him serious bodily harm therewith, and that the defendant did willingly enter into a renewal of such combat or begin such combat and did shoot with a pistol and thereby kill the said Hiram McCleskey, the defendant can not justify such killing on the ground of self-defense, but the defendant would be guilty of manslaughter or of some higher grades of homicide.

"However, if you do not find from the evidence beyond a reasonable doubt that the defendant entered into said personal encounter intentionally intending to use said deadly weapon upon the deceased, or that after he had been assaulted by or had a personal conflict with the deceased and said conflict ceased that he voluntarily or intentionally invited or renewed said conflict, intending to kill or inflict serious bodily injury upon said Hiram McCleskey, then you will not consider that the defendant's right or plea of self-defense, if any, is abridged or in any manner impaired, if in fact he acted in self-defense at the time the deceased was shot as it then appeared to the defendant." We think the dying statement of McCleskey taken in connection with the physical facts on the ground, demanded and required the court to charge on these issues, and while the charge may be subject to some criticism, it occurs to us that the instructions as a whole are not subject to serious complaint.

Criticism is made of the first paragraph of the above quoted instruction in that the jury were required to find that McCleskey in good faith had abandoned said conflict. If this clause stood alone, it might be subject to criticism, but the court instructed the jury that if they found that McCleskey in good faith had abandoned said conflict and fled from defendant and that he was in no danger of violence from the deceased, "and that the defendant knew the same, and that knowing the same, defendant shot and killed the deceased, he can not justify such killing on the ground of self-defense." It is undoubtedly true that if there had been an abandonment of the difficulty by the deceased, whether in good faith or bad faith, yet if the jury should also find, as under this instruction they were required to do, that appellant was in no danger of violence from the deceased, and that he knew

he was in no danger of violence, and with this knowledge he shot and killed deceased, he could not justify on the ground of self-defense. It is also true that if the parties engaged in the mutual combat with the agreement, as suggested by some of the evidence, that they were to have a fist fight, and appellant at the time of so engaging in such encounter intended to use a deadly weapon, and that pursuant to such intention, after entering said combat, he shot and killed deceased, he could not justify such killing on the ground of self-defense. The facts to our minds also clearly raise the issue of abandoning the difficulty, and in this connection the jury were instructed and required to believe before they could deny to appellant his perfect right of self-defense, that he *knew* that such conflict or assault had ceased, and knowing that it had been abandoned he intentionally renewed said difficulty, intending at the time to slay the deceased, or to do him serious bodily injury, and that he willingly entered into such renewal, or began such combat, and shot McCleskey. Some criticism is made of these charges on the ground that the jury were required to find beyond a reasonable doubt that not only deceased and defendant entered into a personal combat, or that the deceased assaulted defendant and that the charge has the effect of shifting the burden of proof from the State to the defendant, and in support of this proposition we are referred to the case of Huddleston v. State, 54 Texas Crim. Rep., 93, 112 S. W., 64. It is not believed, however, that that case supports the proposition here. In the same connection and in support of the same proposition we are also referred to the case of Rockhold v. State, 16 Texas Crim. App., 577. We do not think this case is in point. As we understand the matter, the rule laid down in the case of Pitts v. State, 29 Texas Crim. App., 374, is applicable here. It must be remembered that the court had already fully instructed the jury in respect to the law of self-defense. In the paragraphs of the court's charge complained of, the court was undertaking to instruct the jury with reference to issues made by the State's evidence which, if sustained by the proof, would or might deny him the benefit of his plea of self-defense. It was these incriminating facts which by these instructions were required by the court to be found to be true beyond a reasonable doubt. In the Pitts case, supra, the court instructed the jury as follows: "If the defendant had been informed that said Stern had used insulting language about his (defendant's) wife, and when defendant heard of said language the same created in the mind of the defendant such passion as to render his mind incapable of cool reflection, and acting under the impulse of said passion, if any, he, with a gun, shot and killed the said Stern the first time he met him after he had been informed that Stern had used insulting language about his (defendant's) wife, then you are instructed he would be guilty of manslaughter. And if you believe from the evidence, beyond a reasonable doubt, that the defendant did kill

said Stern in the manner and under the circumstances as before explained in this paragraph, then you will find the defendant guilty of manslaughter and assess his punishment." And complaint was made of the charge because it required the jury to believe beyond a reasonable doubt all the facts necessary to reduce the homicide to manslaughter before they could reduce the grade of the offense, and reference is had to Rockhold's case, 16 Texas Crim. App., 577. In this case the court say: "We think that the complaint is unwarranted and untenable. The court has evidently disposed of the higher grades, and is now instructing as between manslaughter and self-defense. As between these two issues the jury must find manslaughter beyond a reasonable doubt. He is not applying the reasonable doubt to manslaughter as a lesser degree, but to manslaughter as a crime, as against self-defense, or no crime at all, and in such case the jury are properly told they must find manslaughter beyond a reasonable doubt to warrant a conviction of that crime." The case, as we believe, presented all the issues upon which the court charged. In the nature of things in order to defeat appellant's right of self-defense, the burden rested on the State to show mutual combat, provoking the difficulty or abandonment of the difficulty by the deceased and it is inconceivable that any jury could have been misled by the language of the court's charge. This case is quite similar to that of Howard v. State, 53 Texas Crim. Rep., 378, 111 S. W., 1038, in which we said: "Counsel for appellant sometimes overlook the fact that it is just as necessary and as much required of the court to submit to the jury issues raised by the State's evidence, and on which, under the law, a conviction could be had and ought to be had, as it is to submit matters wholly defensive. If it were true that Crump had abandoned the difficulty, was standing some thirty feet from appellant, and was making no demonstrations to assault appellant, and if it be true, as some of the evidence indicates, that appellant returned to where deceased was, and while he was committing no hostile act, or making any demonstration to commit a hostile act, shot and killed him, it would not be in self-defense, and, the evidence raising such issue, the learned trial court not only was justified, but was required, to submit the phase of the case, and seems to have done so very clearly and in a manner which furnished no just or fair ground of criticism or complaint. In the case of Garner v. State, 34 Texas Crim. Rep., 356, 30 S. W. Rep., 782, it appeared that the defendant there, after being attacked by the deceased with a knife in a difficulty arising over a game of cards, left the room, and returned to the door, where he struck deceased. The evidence was conflicting, it seems, as to whether deceased pursued defendant. In that case it was held that if Garner, after having gained a place of safety and without grounds for anticipating further injury from deceased, armed himself and returned to the conflict, he could not defend on the ground of self-defense, and that a charge submitting this issue

was not ground for reversal, as being unwarranted by the evidence, where the court also charged that said defendant, if reasonably apprehensive of death or serious bodily harm from deceased, and if it reasonably appeared to him that deceased had not abandoned the attack and he was still in danger, had the right to return and kill the deceased." It is a matter of some difficulty to present these issues in the light of the decisions of this court, without an impairment of appellant's right of self-defense, but the court seems, as we believe, to have acquitted himself well of the task thus imposed upon him.

Appellant requested a number of special instructions which were refused by the court. These we have carefully examined and do not think there is any error in respect to any of them.

Complaint is made that the court erred in declining to permit appellant to prove by the witness Shepard a statement made by deceased, some two years or more before the homicide, in respect to appellant. This witness, if permitted, would have testified that deceased told him that he had sent his minor son to appellant's house a few mornings before that to get some whisky for a sick boy, and that defendant refused to let him have the whisky, and that he, McCleskey, had no use for a man who would treat him in any such way. This testimony was offered for the purpose of corroborating the defendant's statement as to the origin of the ill-will of the deceased towards the defendant, and was also offered, not as the details of former difficulty, for there had been none, but as declarations of the deceased about a matter which under the circumstances no reasonably prudent person could take exceptions to, and as illustrating the character of the deceased, and the knowledge of appellant of such character at the time he met the deceased. This bill is allowed by the court with the explanation that at the time offered he told the attorneys for the appellant that the existence of any former trouble or ill-feeling in the past up to the time of the killing might be proven, but that the details of former trouble or ill-feeling that were not explanatory of, or cast no light on the transactions immediately connected with the fatal difficulty beyond the mere existence of ill-feelings were irrelevant and could not be introduced, and the court permitted the defendant to prove by witnesses Shepard and Long that ill-feeling existed between the parties or by the deceased towards the defendant. We think, in the first place, it is a matter not of any special importance, and as explained by the court his action in this matter was not reversible error. A similar question was raised in respect to the testimony of W. R. Long, who, if permitted, would have testified that he heard deceased tell W. A. Davis that it was appellant who had been interfering with his conversations over the telephone, and no one else but appellant would treat him, deceased, in such a way. The court allowed this bill with this qualification: "The alleged conversation showed no threats, was remote from the fatal difficulty, and seemed to be more of an effort

to attack the deceased's character by giving special conversations or special acts of the deceased that throw no light on the fatal difficulty except that ill-feeling existed at that time, which the court had already allowed to be testified to by said witness." It is true, indeed, that the testimony showed that there was ill-feeling between the parties; in fact, wholly out of proportion to the gravity of the cause on which it seems to have been based, and if admissible at all the introduction of these trivial matters could not, as we believe, have aided appellant. The case is one peculiarly of fact. Under appellant's statement, the jury were well justified in acquitting him. If the dying statement of the deceased is to be believed, and if when he was shot he had abandoned the difficulty, was unarmed and was seeking refuge in flight and was at a distance of thirty-five or more yards from appellant when shot, still fleeing, and the jury so believed, there was no escape from a conviction of at least manslaughter.

From a careful examination of the record, we are convinced there was no error committed on the trial for which we ought to reverse the case. The jury have passed on the questions of fact and have found adversely to appellant and their verdict has received the sanction of the trial court and must and should be affirmed, which is hereby done.

*Affirmed.*

[Rehearing denied January 26, 1910.—Reporter.]
McCord, Judge, not sitting.