# M. Hunter v. The State.

No. 19909.   Delivered April 5, 1939.
Rehearing Denied May 31, 1939.
Application for Leave to File Second Motion for Rehearing Denied June 14, 1939.

The opinion states the case.

*J. S. Callicutt, Lovett & Lovett*, and *W. D. Ralston*, all of Corsicana, for appellant.

*Lloyd W. Davidson*, State's Attorney, of Austin, for the State.

HAWKINS, Judge.

Conviction is for murder, punishment assessed being five years in the penitentiary.

Appellant and deceased (Frank Murphy) had been neighbors for many years, living in the same community and only a short distance from each other. They had been friends prior to the homicide. Situated on Highway 75 a few miles south of Corsicana was a place called Allmon's Filling Station where both gasoline and beer were sold. The usual way traveled by appellant in going to said station as well as to Corsicana led by Murphy's house, from where the station could be seen. On the day of the killing appellant and Murphy met at the filling station. Each of them consumed several bottles of beer. They became involved in a silly argument over whether Murphy could beat a marble machine which was in operation at a night club situated a short distance from the station. The argument culminated in a fight between appellant and Murphy. In the fight or scuffle appellant fell or was knocked down. Allmon separated them and told them he couldn't have any fighting there and that one of them would have to leave. Appellant said he would go home. Allmon took him by the arm and went with him to appellant's car. At this point Allmon's testimony is that "they were cussing one another back and forth while he was getting in the car. Mr. Hunt said to Mr. Murphy when he left my filling station he was going home and get his gun and he would be back and he had just as well get his, or get ready, or something to that effect. Mr. Murphy said, 'I hope you do get your gun.' That was about all that was said, and Mr. Hunter drove on." Appellant went home driving rapidly and was seen by witnesses at Murphy's house as appellant passed going in the direction of his house. A few minutes after appellant left the filling station Murphy also left, riding with a neighbor to a point near his (Murphy's) home. A short time after Murphy reached his house appellant

was seen coming back, driving not so rapidly as before when he passed Murphy's place. He was seen by parties at Murphy's to drive up to the filling station and get out of the car. He only remained at the station a few minutes when he again got in his car and went back towards Murphy's, which was also in the direction of his own home. Allmon's testimony was that when appellant came back to the filling station and witness first saw him he was in the driveway with a shotgun in his hand, and called twice for Murphy to come out; witness told appellant Murphy was not there, opened the door and told him to look. Appellant told witness to stand back out of the way, walked to the door and looked in. Appellant then started to leave and witness advised him "not to go down there like he was, he ought to wait until he sobered up and he would feel altogether different about it." Appellant made no reply but got in his car and left going towards home, but stopped at Murphy's. After appellant passed Murphy's going back towards the filling station Murphy got his pistol and buckled it on with the scabbard at his back so the pistol could not be seen from the front. Appellant had lost a radiator cap off his car as he drove by Murphy's some time in passing. Someone had picked it up and laid it on the back porch. The facts as related up to this point were established without controversy.

According to Mr. Allmon's testimony the fight between appellant and Murphy at the filling station amounted to little and no one got hurt to amount to anything. According to appellant's wife he was pretty considerably "bunged up" as a result of the fight.

The conflict in the testimony begins at the point where appellant stopped his car in front of Murphy's house. A sister and daughter of Murphy were eye-witnesses and their evidence is in accord to the following effect. When appellant stopped his car in front of the house he got out with the gun in his hand, having it out in front of him, and made two or three steps toward the house. Murphy went out the back door, picked up the radiator cap in his left hand and went towards appellant, offering to give him the radiator cap. When Murphy was within about fifteen steps of appellant, and having nothing in his hands but the radiator cap, appellant fired at him with the shotgun. Murphy then got his pistol from the holster and fired several times at appellant. Murphy then retreated to the rear of the house and was followed by appellant with his "gun up." One of the witnesses got between appellant and Murphy. After Murphy reached a point at the rear of the house appellant ran between him and the door, cutting him off from

entering the house. Appellant then fired twice more at Murphy with the shotgun, it being one of the last two shots which killed him. A son of Murphy did not see the shots fired, but testified that a loud report first came from the front yard, followed by three not so loud, and then two more loud reports came from the rear of the house. Miss Kelly, a young lady 18 years of age, lived about 300 yards from Murphy's house, which she could see plainly. She saw appellant driving rapidly on the road going towards the filling station and then returning towards Murphy's. Her testimony follows: "I saw him when he drove into the Murphy yard. I did not see him get out. The first report I heard was the loud report of a gun. Just in a few seconds after that, or a few moments, I heard two or three more shots not quite so loud. The group of shots I heard were not none as loud as the first shot I heard. That attracted my attention in that direction. When I first heard the reports I saw a man running another man, I took it to be Mr. Hunter running Mr. Murphy, toward the back of the house, * * * and when Mr. Murphy was about half way between the garage and the house he stopped, he didn't fall, and I heard two more shots along there, then he disappeared between the overhead tank and the garage, and when he disappeared I saw this man go in after him, I took it to be Mr. Hunter, I couldn't tell then, but he had a shotgun in his hand; I saw the barrel of the shotgun in the sunlight glistening. The man doing the chasing had the shotgun. * * * When the man disappeared I said I heard one or two shots. Those shots were loud, awfully loud."

Appellant did not testify. He put his defense into the case through a res gestae statement testified to by his wife. After the killing appellant did not leave the scene in his car but ran towards home on foot. His wife met him. She testified that appellant made to her the following statement. "He told me about the shooting. He told me just after he got the gun he went to Allmon's Filling Station. He said he was going back over there to make peace with Mr. Murphy and beg his apology over at the station, and said he went back, and started back home, and he said he intended to come on home, Mr. Murphy was not at the station, he was going to come on home, and Mr. Murphy walked out and stopped him as he was coming through with the radiator cap in his hand, had it in his left hand, and he said he stopped and got out of the car and was going to get the radiator cap and Mr. Murphy shot at him three or four times and he went back to the car and got his gun out of the back of the car. And afterwards, of course,

naturally he shot Mr. Murphy. He didn't tell me where the shooting occurred, whether in the back or front yard, I did not ask him that question."

Appellant called a number of witnesses who were so situated that they could see no part of the shooting but heard the reports of the guns. These witnesses testified. that the first shots heard by them,—being three or more—were not so loud as shots coming afterwards, leaving the inference that the first group of shots were from a smaller gun,—Murphy's pistol— and the later shots from appellant's shotgun, thus supporting appellant's claim that Murphy fired first.

We have been at pains to set out the salient facts in some detail because in our view of the case only two questions require discussion, and each of them turns on the evidence.

At the request of the State the court gave the following special charge on abandonment of the difficulty by deceased.

"The right of self-defense commences when the necessity therefor arises, and continues as long as there is real or apparent danger, and ceases when such real or apparent danger disappears. A person who is justified in firing the first shot, is justified in continuing to shoot as long as it reasonably appears to him, from his standpoint at the time, that his life or person is in danger at the hands of his adversary, that is, until the danger, real, apparent or threatened, as he sees it, has ceased, but he has no right to continue to shoot after he is aware that the danger, real, apparent or threatened, has ceased; and where a person knows that his assailant has abandoned the difficulty or has fled or is fleeing to a place of safety, and is making no further apparent effort to renew such difficulty, and such person thereafter pursues his assailant knowing that all real or apparent danger is over, and shoots and kills him, that homicide is unlawful. A person has no right to pursue and kill his adversary after the latter has in good faith abandoned the difficulty, and the former knows that all danger to him has ceased; and, if such person, under such circumstances, nevertheless, pursues and kills his adversary, his act in doing so would not be justified on the ground of self-defense. But, under such circumstances, the accused's right of self-defense is not forfeited, abridged or impaired unless his adversary has abandoned the difficulty in good faith, and the accused knows that he has done so, and, so knowing renews the attack and kills his adversary.

"Now, if you believe from the evidence, beyond a reasonable doubt, that the deceased and the defendant engaged in a diffi-

culty in deceased's front yard in which the deceased and the defendant exchanged one or more shots at each other, and you further believe from the evidence beyond a reasonable doubt that after such exchange of shots, if any, deceased in good faith abandoned the difficulty and retreated to his back yard, if he did, and did not thereafter renew such difficulty with defendant, but that defendant pursued deceased into his back yard, if he did, and you further believe from the evidence beyond a reasonable doubt that at the time defendant pursued deceased into his back yard, if he did, that defendant was aware that the danger, real, apparent or threatened to his life or person had ceased, and that deceased had in good faith abandoned the difficulty, if he had, and that defendant, so knowing and realizing, if he did, thereafter shot and killed the deceased, if he did, then, in that event, his act in doing so would not be justified on the ground of self-defense; but unless you do so believe beyond a reasonable doubt, or if you have a reasonable doubt thereof, then, in such event, defendant's right of self-defense would not be forfeited, abridged, or impaired."

Appellant filed various written objections to said special charge, among them being that: (a) it was argumentative, (b) upon the weight of the evidence, (c) conveyed to the jury the idea that the court was of opinion that deceased had abandoned the difficulty, (d) improperly limited appellant's right of self-defense set out in the main charge, (e) that there was no evidence that deceased ever abandoned the difficulty, (f) that the court nowhere charged the jury that appellant had the right to pursue deceased if he was seeking a point of vantage, (g) that there was no evidence in the record to support such charge.

It would extend this opinion to unpardonable limits to undertake to point out wherein the State's special charge is not subject to the various criticisms indicated above, but in our judgment every one is refuted by the charge itself, and by the evidence in the record, unless it be the one referred to in subdivision (f) as to the question of "vantage point." Having given the special charge requested by the State, the trial judge— in view of the complaint thereat in subdivision (f)—very properly gave at the instance of appellant the following special charge.

"You are instructed as part of the law in this case that if you believe from the evidence that after the deceased had shot at the defendant and before the defendant shot at him, and

that after the first shots were fired the deceased withdrew or retreated to a vantage point from which to renew the attack, or threatened attack, if any, then you are instructed that the defendant would have the right to pursue the deceased and shoot him as long as it reasonably appeared to him to be necessary to protect himself, but no further."

The propriety of instructing the jury on the question of abandonment of the difficulty by deceased when such issue is raised by the evidence has long ago been settled by our decisions, coupled of course, with instructions on the right of accused to pursue if it appears to accused that his adversary is seeking a vantage point. See Bordeaux v. State, 58 Tex. Cr. R. 61, 124 S. W. 640, 645, McMahon v. State, 46 Tex. Cr. R. 540, 81 S. W. 296. Many other cases are cited in Branch's Ann. Tex. P. C. under Sec. 1966, p. 1167, and in 22 Tex. Jur., Sections 34 and 36, pages 429 and 432. It occurs to us that the evidence raised the issue and that the court in his instructions properly protected the rights of both the State and appellant.

In addition to specific objections to the State's special charge on abandonment of the difficulty already adverted to appellant filed objections to the main charge, said exceptions covering nine pages of the transcript, and consisting of thirty one paragraphs. Obviously it would be impractical to discuss each of said objections. They have all been considered in the light of the instructions as a whole and we discover no basis for the criticism. It is not inappropriate to say that the main charge in connection with the special charges given impresses us as an admirable application of the law under the facts here present.

The court charged on provoking the difficulty. We find no basis for criticism as to the manner in which such issue was submitted. Appellant objected to any instruction on said subject, insisting that the evidence failed to raise such issue. We are inclined to the view that the evidence speaks for itself in that regard. Whether such an issue was raised turns on what appellant may have said or done after he reached Murphy's house, and not on the mere fact that he went there, but as was said in Airhart v. State, 40 Tex. Cr. R. 470; "Of course, we would look to his preceding conduct to characterize or lend significance to his conduct at the time of the meeting." If Murphy fired first what caused him to do it? Was it because appellant had shortly theretofore threatened to go home and get his gun, and appeared at Murphy's house and got out of his car with a shot gun in a threatening manner? If appellant

did this was it calculated to cause Murphy to fire first, if he did? If appellant did this was it his purpose to induce Murphy to commit the first overt act—firing first—in order that appellant might have a pretext to kill deceased? It occurs to us that these questions were in the case and without some instruction relative thereto the jury would have been without information as to what course to pursue in the premises. Under these circumstances reference to particular cases is of little aid because the facts are variant in each case, and those of the particular case must control. We cite Banks v. State, 131 Tex. Cr. R. 196, 97 S. W. (2d) 219, and Norwood v. State, 120 S. W. (2d) 806 as presenting facts somewhat similar to those here present. The cases mentioned announce no new principles, but the facts there, as here, seem to make proper the application of principles long recognized in our law.

Discovering no error upon which a reversal may properly be predicated, the judgment is affirmed.

### ON APPELLANT'S MOTION FOR REHEARING.

KRUEGER, Judge.

Appellant, by his able counsel, has filed an exhaustive and vigorous motion for a rehearing in which he contends that this court erred in the original disposition of this case.

We see no need in discussing each of his contentions in detail, but content ourselves with a discussion of the two main legal propositions advanced by him, relative to the court's instruction on provoking a difficulty and on the court's failure to instruct the jury concerning appellant's right to arm himself, seek the deceased and demand of him an explanation of why he struck him (appellant).

Appellant maintains that the issue of provoking a difficulty was not raised by the evidence and an instruction on the law relative thereto was an impairment of his right of self-defense. He contends that we misquoted and misconstrued the testimony by which the issue was sought to be raised.

There is no question but that appellant and the deceased had a difficulty at the filling station a few minutes prior to the time that the fatal shots were fired. The owner of the station, Mr. Allmon, told them that one of them would have to leave; that he did not want any fighting there. Appellant remarked to Murphy that he was going home, get his gun and come back, and that Murphy might as well get his. Appellant then drove away in his car, but returned in about twenty

minutes with a shotgun and called for Murphy to come out. Allmon told appellant that Murphy was not there; that he had gone home, but appellant went to the door of the office carrying the shotgun in his hands. Not seeing Murphy, he entered his car and drove to Murphy's home. He stopped in the **road** in front of the house, got out of his car with the shotgun and took a few steps forward. When Murphy appeared with appellant's radiator cap in his hand, (which one of the boys had found), he remarked to appellant: "Here is your radiator cap— I will give it to you."

From evidence in the record, it might be concluded that appellant made no reply, but raised his gun and fired; that deceased then drew his pistol from a scabbard buckled to his trousers on the back of his person and fired, and then retreated to the back of his home; that appellant followed and fired two more shots, both of which took effect. However, there is evidence in the record from which the jury might have found that the deceased fired first. If so, then in our judgment the court properly charged on provoking the difficulty on the theory that appellant's conduct caused deceased to fire at him. When all that was said and done by appellant when he left the filling station, together with his subsequent acts and conduct at the time of the killing are taken into consideration, no doubt is left in our minds that the issue of provoking a difficulty was raised by the evidence. Consequently an instruction thereon was proper.

Appellant seriously contends that we misconstrued the evidence in this: That we stated that appellant, after he had gotten out of the car, approached the home of Murphy. He says there is no evidence which justifies this statement. Miss Evelyn Murphy testified as follows: "I saw Hunter (appellant) run up in front of the house and stop, get out of the car and move about three feet from there and then move a step or two more. I didn't see Hunter move forward any more." It seems that he wants this Court to construe the language to mean that when he took the steps forward, he was taking them away from the home and not toward it. Such a construction is not justified, because if he were going away from the house and not toward it, there would have been no need for him to have stopped the car in the road and gotten out. He might have continued driving.

We recognize as sound the general legal proposition that a person has a right to arm himself and seek his adversary for the purpose of a peaceful solution as to their differences, and

that when such an issue is raised, a defendant is entitled to an instruction relative thereto.

But in the instant case, appellant did not testify as to his purpose of going armed to the home of the deceased. Consequently, we must look to his expressions when he first left the filling station, and also his subsequent acts and conduct up to the time of the fatal difficulty to determine his purpose. There is no evidence in this record raising such an issue and calling for an instruction such as was requested by appellant. Consequently, he was not entitled to it.

Appellant has cited us to a number of authorities which he contends support his contention. We have examined them and they announce correct rules of law, but they are easily distinguishable from the instant case on the facts.

We have again reviewed the entire record in the light of his motion, but see no good reason for receding from the original conclusion reached by us.

The motion for a rehearing is accordingly overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON APPLICATION FOR LEAVE TO FILE SECOND MOTION FOR REHEARING.

GRAVES, Judge.

On account of the urgent insistence of appellant's attorneys, reiterating many propositions heretofore urged as evidencing error in the trial of this cause, we have again reviewed the entire record, and have patiently gone over the authorities offered us. We remain convinced of the correctness of the views expressed in our original opinion and the opinion on the motion for a rehearing, and must respectfully decline the request for leave to file this second motion for a rehearing.