# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00794-CR

**Fred Yazdi, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT
NO. 12-0204-K26, HONORABLE BERT RICHARDSON, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted Fred Yazdi of murder, and the trial judge assessed sentence of twenty years in prison. Yazdi contends that the trial court erred by denying his request to instruct the jury on his right to pursue an attacker and on the State's failure to collect and preserve evidence from the scene. We will affirm the judgment.

## BACKGROUND

Appellant's conviction for murder arises from a series of events that took place in the early morning hours of February 3, 2012. As twenty-three-year-old Enrique Recio drove home intoxicated shortly before 3 a.m., he hit a light pole on Avery Ranch Boulevard. Recio left his car and called a friend to pick him up. People who stopped in response to the wreck reported speaking with a pedestrian who was talking on a cell phone and seemed nervous, then fled. Police officers who responded to the crash site looked for the driver, then were redirected by dispatch to a reported burglary and possible attempted home invasion at Yazdi's nearby home. Upon arrival, they found

Recio lying on a sidewalk near the street, dying from three bullet wounds and appellant Yazdi standing in his yard a few feet away on the other side of a four-foot iron fence, holding a gun.

At Yazdi's trial, Austin Police Officer James Ayers testified about his observations as the second officer to arrive at Yazdi's home.[1] The first officer directed Yazdi to put the gun away, and Yazdi complied. Ayers testified that Yazdi calmly said that his wife had woken him saying that someone was in the front yard. Yazdi said he believed that Recio was trying to burglarize his home, though Recio had only banged on his front door and did not enter. Yazdi said he grabbed a gun, went outside, and saw Recio hiding under one of the Yazdi family's vehicles in his driveway. Yazdi told Recio not to run or he would shoot. Recio started running away, so Yazdi shot him. Ayers testified that Yazdi said he was afraid of Recio, but that Yazdi never said that he had been attacked, and Ayers said he did not see any signs of injury on Yazdi or forced entry on the house. Yazdi did not at any point tell him that Recio had run toward him, made a movement toward him, or seemed to be holding a weapon. Based on Yazdi's statements to him, Ayers testified that Recio was retreating before he was shot, "starting at the front door, going to the vehicle, where the vehicle was parked, and then further out on the property towards the fence adjacent to the road." Ayers testified that Yazdi never said anything to him about Recio holding a weapon when crawling over the fence, though he conceded on cross-examination that he did not recall anyone specifically asking Yazdi whether he thought that Recio had a weapon.

APD Officer Robert Broomhall was the third officer on the scene. He testified that Yazdi said he did not want Recio to escape, and that when Recio ran away Yazdi shot him.

---

[1] The first officer to arrive did not testify. Ayers testified that the first officer to arrive was on vacation at the time of the trial. The trial court admitted into evidence videos from the scene from the first officer's car as well as Ayers's car.

2

Broomhall testified that Yazdi said he was scared of Recio but did not say why. Broomhall testified that Yazdi said he was not sure whether Recio had a weapon, but never stated he saw one.

APD Officer Abraham Deutchman testified that he transported Yazdi from the scene to police headquarters. On a video from inside the patrol car, Yazdi states that he gave Recio "many opportunities to stop," but Recio did not. Yazdi also stated that Recio "turned around towards me [again[2]] and I was in fear of my life." Deutchman testified, however, that Yazdi never stated that the victim had pointed a gun at him, had a gun, attacked him, or moved toward him aggressively. Indeed, Deutchman testified that appellant told him he shot Recio because he did not obey his commands to stop running away.

Former APD crime-scene specialist Joseph Morales described what he did to document the scene. He took photographs of the scene, Recio, Yazdi, and the inside of the house. He swabbed Yazdi's hands for gunshot residue and collected a firearm, spent shell casings from outside, live rounds from inside the house, samples from unidentified stains on the driveway, and the blanket that was placed over Recio's body. When questioned by Yazdi's counsel, Morales acknowledged that he did not take any swabs from the fence or attempt to find prints or fibers on the front door or on or under a car.

APD Detective Richard Jennings testified that police found no evidence of attempted forced entry on Yazdi's home, vehicles, or the backyard, including the fence and the locked gates. He testified that he found nothing at the scene consistent with an attempted forced entry—no damage to the door, the inset stained-glass window, the doorbell, or the doorknob, and no disturbance of the mulch or vegetation around windows on the house. Two live rounds were found inside the house

---

[2] There was uncertainty whether Yazdi said "again."

near the front door, which Jennings testified was consistent with someone racking the slide on a handgun to fill the chamber with a live round. He testified that he found no blood at the scene except where Recio was found outside of Yazdi's yard and that stains noted on the driveway did not test positive for blood. When questioned by Yazdi's counsel, Jennings said he did not attempt to take prints off the doors, windows, or doorknobs of the home, nor did he attempt to collect evidence from the fence or footprints from the yard. He said that it rained the whole time he was at the scene and that he would not expect to find fingerprints on the car or the fence because the skin oils would have washed off and also because he could not have used fingerprint powder in those conditions. In response to questions from defense counsel, he conceded that the door to the house was dry and that there was a dry spot under the car. Detective Jennings answered "Correct," when defense counsel asked "And it was clear—without dispute, really, am I right—that Mr. Yazdi's on one side of the fence, the body of Enrique Recio is on the other side of the fence when the patrolman arrives at the scene?" Jennings also agreed that all of the evidence of discharged shell casings indicated that Yazdi fired his gun from inside the fenced area. Recio was found with a wallet and car keys in his pocket and a cell phone underneath his body.[3] In response to a question from Yazdi's lawyer, Jennings acknowledged that some handguns are the size of cell phones.

APD Detective Derek Israel also testified, saying that he saw no signs of attempted forced entry on the home, its windows, its gates, or the vehicles. He testified that a person trying a

---

[3] Laleh Yazdi, appellant's wife, testified at the punishment phase that, when she saw Recio on her lawn, she could see something in his hand that she believed was a gun (but that she conceded under cross-examination could have been a cell phone) and that she warned Yazdi that the man could shoot him. That evidence was not before the jury at the guilt-innocence phase of the trial.

doorknob might not leave signs of attempted forced entry, but might leave fibers, fingerprints, body oils, or DNA. He did not know of any blood-spatter evidence being collected.

Dr. Vickie Willoughby conducted an autopsy of Recio. She testified all of Recio's wounds were consistent with being shot from the side and below, and that two shots came from slightly behind but not in Recio's back. She said this could be consistent with a victim who was pivoting to his left while being shot. She testified that the wounds could be consistent with Recio falling backward over the fence as he was shot, though many scenarios were possible. She agreed that Recio might have been shot while on the fence, fallen outside the fence, then crawled a short distance. Willoughby testified that she did not find any soot, stippling, or muzzle abrasions, the presence of which would indicate that the shots were fired from close range. She testified that Recio tested positive for marijuana use, though she could not tell when that use occurred, and that he had a blood-alcohol content level of .16. She found evidence of atropine in his system, a pharmaceutical that is sometimes used recreationally and can cause hallucinations and delirium; however, she also testified that EMS records showed that atropine was administered to Recio three times after the shooting.

At the guilt-innocence phase of the trial, Yazdi did not testify or present witnesses. Yazdi offered and had admitted as documentary evidence a diagram of the crash scene and a photo of Recio's friend who had gone to a music show earlier on the night of this incident. Because Yazdi's issues on appeal do not address the punishment phase, we will not recount the evidence and testimony presented there.

DISCUSSION

Yazdi complains on appeal that the trial court erred by refusing his requested instructions in the charge to the jury on the right to pursue and on the failure to preserve evidence. Attempting to act pro se while represented by counsel, Yazdi also sent to this Court's clerk's office a Motion to Extend Time for Filing the Appellant's Reply Brief and a copy of a letter he addressed to his attorney in which he discusses additional issues.

**Standard of review**

We review claims of jury charge error under the test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd). We first determine whether error exists, then evaluate the harm caused by any error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Swearingen*, 270 S.W.3d at 808. The degree of harm required for reversal depends on whether that error was preserved in the trial court. *Ngo*, 175 S.W.3d at 743; *Swearingen*, 270 S.W.3d at 808. When error is preserved in the trial court by timely objection, the record must show only "some harm." *Almanza*, 686 S.W.2d at 171; *Swearingen*, 270 S.W.3d at 808.

**Yazdi's complaint of jury charge error**

Yazdi was charged with murdering Recio by: (1) intentionally or knowingly causing Recio's death; (2) intending to cause serious bodily injury and committing an act clearly dangerous to human life, namely shooting Recio and causing his death; and (3) intentionally or knowingly committing or attempting to commit a felony and in the course of and in furtherance of the commission or attempt, committing or attempting to commit an act clearly dangerous to human life.

The jury was instructed in the trial court's charge on a number of defenses that, if found, would justify Yazdi's conduct, including Texas Penal Code provisions on self-defense, defense of others, and defense of property, as well as the related right not to retreat. The jury was instructed that a person is justified using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself or a third person against the other's use or attempted use of unlawful force. The jury was instructed that, when a person is attacked with unlawful deadly force or reasonably believes he is under attack (or attempted attack) with unlawful deadly force, and "there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury," then the law excuses or justifies such person in resorting to deadly force to the degree that he reasonably believes immediately necessary, as judged at the time, to protect himself from such attack or attempt.

The jury was also instructed that an actual attack is not necessary, and the person has a right to defend his life and person from an apparent danger "as fully and to the same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger, as it appeared to him from his standpoint at the time, and that he reasonably believed such deadly force was immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force." The jury was also instructed on the Texas "stand your ground" law under which a person who has a right to be at the location where deadly force is used, who has not provoked the original person against whom the deadly force is used, and who is not engaged in criminal activity when the deadly force is used, is not required to retreat before using deadly force. On this point, the jury was further instructed that, while it considered whether Yazdi's use of deadly force was necessary, it must not consider whether Yazdi failed to retreat.

7

Yazdi asserts on appeal that an additional instruction should have been given on his right to pursue Recio. Specifically, Yazdi requested the following additional instruction be given:

> In connection with the right to self-defense, you are further instructed that if you find from the evidence that Fred Yazdi was acting in defense of himself or in defense of Laleh Yazdi, Rod Yazdi, or Cyrus Yazdi, in the first instance when he opened fired on deceased with his pistol, or if you have a reasonable doubt thereof, then you are further instructed that not only may Fred Yazdi stand his ground and shoot, but he had the right to pursue the deceased, Enrique Recio, so long as it reasonably appeared to him, at the time, that all danger had not passed, as viewed from his standpoint alone.

Yazdi draws this language on the right to pursue from two Texas cases that predate the modern penal code—*see Hunter v. State*, 128 S.W.2d 1176, 1180 (Tex. Crim. App. 1939); *Thompson v. State*, 276 S.W. 699, 702 (Tex. Crim. App. 1925)—as well as an opinion from the Fort Worth Court of Appeals applying those cases. *See Taylor v. State*, 947 S.W.2d 698, 705 (Tex. App.—Fort Worth 1997, pet. ref'd). We do not find cases applying the reasoning of the *Taylor* court on this issue, however.

Instead, binding precedent from the Texas Court of Criminal Appeals requires us to conclude that the trial court was not obligated to give Yazdi's requested right-to-pursue instruction in addition to the self-defense, defense-of-others, and right-not-to-retreat instructions that were given. *See Walters v. State*, 247 S.W.3d 204, 209 (Tex. Crim. App. 2007). In *Walters*, the court held that if a defensive theory is not explicitly listed in the penal code, then the trial judge should not instruct the jury on it. *Walters*, 247 S.W.3d at 209. The right to pursue is not among the defenses to prosecution listed in the penal code. *See* Tex. Penal Code §§ 9.01-.63. The jury was instructed regarding a host of defenses listed in the penal code including the right to self-defense, to use deadly force in self-defense, to use force and deadly force in defense of others, to use deadly

8

force to protect his property, and the right not to retreat. *See id.* §§ 9.31-.33, .42. Under *Walters*, it would have been error for the trial court to give Yazdi's requested instruction on the right to pursue because it is not among the defenses listed in the penal code. *See* 247 S.W.3d at 209; *see also Castaneda v. State*, 28 S.W.3d 216, 225-26 (Tex. App.—El Paso 2000, pet. ref'd).

Further, Yazdi's requested instruction would have been redundant of the instruction given on the right to self-defense under the modern penal code that permits him to use "any means at his command to the degree that he reasonably believes immediately necessary." *See Philen v. State*, 683 S.W.2d 440, 444-45 (Tex. Crim. App. 1984) (affirming trial court's refusal, while giving self-defense instruction, to give instruction in addition to standard self-defense instruction that defendant exercising self-defense had the right to continue shooting the deceased "until all the danger of his life had passed"). Because Yazdi could have proven under the instruction given that he reasonably believed pursuit was necessary to defend, he has shown no harm in the refusal to give his requested instruction. *See Stevens v. State*, 671 S.W.2d 517, 522 (Tex. Crim. App. 1984).

**Preservation of evidence**

Yazdi contends next that the failure by police to collect footprints and other track marks from his yard, fingerprints or palm prints on his door and handle, and fibers or other evidence from his fence caused him to be unable to corroborate his version of events with tangible evidence. He complains that the trial court erred by failing to give the following instruction that he requested to the jury: "You are instructed that evidence in the care, custody or control of the State that is lost or unpreserved raises the presumption that the evidence was unfavorable to the State and is favorable to the Defendant." Yazdi in essence urges that we import the concept of spoliation from the civil realm. *See Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex. 2003) (spoliation

9

instruction justified when relevant evidence is deliberately destroyed or party fails to produce relevant evidence or explain its non-production).

The State asserts that the United States Supreme Court held that, absent a showing of bad faith, the failure by police to preserve evidence does not violate due process. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). In that case, the police collected evidence relevant to a sexual offense but failed to refrigerate it, damaging its usefulness. *Id.* at 53-54. The Court held that the police were at worst negligent and did not violate the defendant's due-process rights. *Id.* at 58. The Court opined that the constitution does not require police to gather particular evidence—stating, for instance, that police investigating a driving-while-intoxicated case may but are not required to administer a breathalyzer test. *Id.* at 59.

In this case there is no evidence of bad faith by police in the collection and preservation of evidence. We find no support for the proposition that the police are obligated to collect every conceivable and available type of evidence and that their failure to do so entitles the defendant to an instruction that this failure gives rise to a presumption that the uncollected evidence would favor the defendant. Appellant has not shown himself legally or factually entitled to an instruction regarding the failure by police to collect evidence from his house and yard and, therefore, has not shown that the trial court erred by refusing the requested instruction.

**Other issues**

Attempting to act pro se despite having a lawyer, Yazdi sent a motion to extend time to file his reply brief. As he is represented by counsel, this Court's clerk received the letter but did not file it. Yazdi is not entitled to hybrid representation. *Rudd v. State*, 616 S.W.2d 623, 625 (Tex. Crim. App. 1981).

10

Yazdi later sent a letter to counsel with a copy to this Court reinforcing his desire to file a reply brief. In that letter he raises a number of issues consistent with his view that he is innocent of murder. He claims that the failure to collect prints from his front door illustrates bad faith that he attributes to animus against him because he is of Iranian origin. Yazdi points to no evidence in the record of this ethnic animus by anyone connected to this case and points to no evidence that any such animus came into play in this case. He complains of the police's characterization of a marijuana cigarette as a "rolled-up cigarette" that was destroyed before he could test it. However, the fact that Recio tested positive for marijuana use was in evidence, undisputed, and had no bearing on the elements of Yazdi's commission of murder or self-defense absent evidence that Recio's conduct justified Yazdi's response. Through cross-examination, Yazdi raised the specter of marijuana being adulterated by substances that cause aberrant behavior, and the jury nonetheless concluded that the evidence did not justify Yazdi in killing Recio.

Yazdi argues that the police's failure to collect evidence could violate due process under state constitutional law. But he does not articulate how—even if all the evidence he describes is presumed to be in his favor—that affects the outcome of this appeal. The police never explained their choice not to collect print evidence from areas not affected by the rain, but they may have chosen not to collect it because there was no dispute that Recio approached the home and yet did not damage or enter it. There was no evidence disputing Yazdi's claim that Recio entered his yard, banged on his door or jiggled the doorknob, hid under his car, and then climbed over his front fence. Despite the presumption of innocence and despite the evidence of the circumstances of Recio's encroachment on Yazdi's property, the jury found beyond a reasonable doubt that Yazdi committed

11

murder that was not justified or otherwise excused.  The arguments Yazdi asserts in his letter to counsel are not properly before us, and we find no merit in them as they are presented.

## CONCLUSION

We affirm the judgment.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Goodwin and Field

Affirmed

Filed:   January 13, 2016

Do Not Publish