Michael M. BANGS, Appellant,

v.

STATE of Alaska, Appellee.

No. 3483.

Supreme Court of Alaska.

March 14, 1980.

Mitchel J. Schapira, Edgar Paul Boyko & Associates, Anchorage, for appellant.

David Mannheimer, Asst. Atty. Gen., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., CONNOR and MATTHEWS, JJ., DIMOND, Senior Justice, and BUCKALEW, J. Pro Tem.

## OPINION

RABINOWITZ, Chief Justice.

Michael M. Bangs appeals from his conviction of second degree murder and his

sentence of fifteen years imprisonment. We affirm both Bangs' conviction and the superior court's sentence.

At the time the homicide occurred, Bangs and his wife had resided at the Lavion Rose Trailer Court in Anchorage for approximately nine months. During this time they had had little contact with Troy Troyer, owner-manager of the trailer court and the victim of the shooting. When Bangs and his wife bought their trailer, they also bought a set of wooden steps that the previous owner had used for access to the trailer. Finding them unsuitable for winter use, he replaced them with a short metal stairway, and stored them under the trailer with the intention of widening the steps into a small porch sometime during the summer and returning them to active use. A few weeks previous to the day of the shooting, Troyer apparently had moved the steps from under the trailer, placing them behind a fence, in the process of performing routine yard maintenance. "A day or two" before the incident Bangs had brought the steps back to his yard—he was making some shelves and was using the steps as a work bench. When he returned home, he noticed that the steps were again missing. Having looked around for them without success, Bangs decided that Troyer had probably moved them again and therefore Bangs went over to Troyer's space to ask about it.

A heated exchange took place between Troyer and Bangs [1] which led to Troyer's screaming, "Don't be fucking with me, I'm a killer, that's what I am," and jumped down from the tailgate of his dumptruck, where he had been perched throughout the foregoing conversation. He immediately began choking Bangs. Bangs broke the hold after a short period of time and pushed Troyer away. Troyer again jumped on Bangs, knocking him to the ground and apparently trying to reestablish the chokehold. This second scuffle took place behind the truck and only partially in sight of the witnesses. Bangs escaped and walked rapidly—he had a leg injury that made running impossible—to his trailer, grabbed his loaded .38 caliber revolver, and returned to the scene of the struggle.[2] Troyer, in the meantime, had climbed back into the bed of his dumptruck.

Bangs testified that he returned, pointed his revolver at Troyer, cocked it, and said something to the effect that if you need to be fucking with me so bad, just come on. Then, according to Bangs, Troyer lunged at him, hitting the gun.[3] Bangs stepped back

1. Witnesses to the verbal exchange that took place can corroborate only the part of Bangs' testimony that describes Troyer's statements, since Bangs was speaking in a conversational tone and Troyer was "screaming." But it appears that substantially the following conversation took place after Bangs said hello and asked whether Troyer knew anything about the steps:

TROYER: I hauled them off.
BANGS: You hauled them off?
TROYER: Yeah, I hauled them the hell out of here.
BANGS: What gives you the right to come and haul off my personal property?
TROYER: The fucking borough gives me the right. I cut your fucking grass. I fertilize your fucking grass, and you'll either abide by the park rules or I'll kick your ass the fuck out of here.

Bangs then told Troyer that the steps were worth fifty-five or sixty dollars and that he wanted to modify them into a porch. Troyer responded that "they were a piece of shit, and that was all a bunch of bullshit," and that "he didn't need [Bangs] or a bunch of Jews from the borough fucking with him." Bangs then

said to Troyer, according to his own testimony, that he "thought it was more of a question of him fucking with me."

2. The amount of time that elapsed during this period is disputed—estimates ranged from "a matter of seconds" to "two or three minutes at the most," and a recreation of the action by the defense places it at around forty-five to fifty seconds.

3. The testimony from witnesses regarding Troyer's actions at this point is conflicting. Kenneth Fields testified that Troyer did nothing when Bangs issued his challenge, and that Bangs then shot him. Thomas Hill testified that Troyer appeared to be getting ready to jump down from the truck when Bangs shot him, but that Troyer never made a move for the gun, being too far away to do so when he was shot. Bangs' wife testified that Troyer said, "Oh, you cocksucker, you went and got your pistol. What do you think you're going to do with that?" According to Bangs' wife, Troyer then started out of the truck, but at that point she began running away, and did not see the actual shooting.

and shot, he said, because "I felt that had Mr. Troyer gotten a hold of me with a loaded gun in my hand, there was no question in my mind that I would be dead. He had already proven to me that he was physically overpowering." Troyer died immediately as a result of the bullet that passed through his chest near the heart.[4]

In this appeal, Bangs alleges that the superior court committed error in four general areas. He argues that the superior court erred in playing back only the direct examination, rather than the entire testimony of a key witness at the jury's request, that the jury's apparent confusion over "specific intent" was inappropriately resolved by the superior court, that the superior court erroneously refused to instruct the jury on "imperfect self-defense," and that the trial court's instructions on the defense of self-defense were inadequate. Bangs also alleges that the sentence imposed is excessive.

After the jury retired to commence its deliberations, they informed the trial judge that they desired to rehear the testimony of a particular witness. The trial judge appears to have interpreted the request as encompassing the whole of the witness' testimony. "I understand, ladies and gentlemen of the jury, you have requested the testimony of Marie Lee on her direct—both as to direct testimony and cross-examination." It subsequently developed that the jury wanted and did rehear only the direct examination of Marie Lee. Bangs argues that the judge's failure to require a replay of all of the witness' testimony constituted reversible error.

Bangs concedes that the issue of whether to replay testimony for the jury is a matter within the discretion of the trial court.[5] In *Ripley v. State*, 590 P.2d 48, 51–52 (Alaska 1979), we explicitly ruled that it lies within the trial judge's discretion to have replayed for the jury only the requested portion of a witness's testimony. In view of the broad scope of discretion

---

4. The major discrepancies in the testimony of various witnesses relate to the distance between Bangs and Troyer at the time the shot was fired and the degree to which Troyer had committed himself to getting out of the truck at that point. The doctor who performed the autopsy testified that the shot was fired more than twenty-two inches away from Troyer's body. Bangs claimed that the shot was fired just as Troyer hit the gun, at a distance of no more than three feet. Estimates ranged through "six to eight feet" up to "ten feet" at the maximum—the latter having been made by a witness who described himself as "not that much of a judge of distance" and who at another time estimated the same distance as "no more than four feet." Troyer's position at the time the shot was fired is likewise the subject of some dispute. Various testimony places him anywhere from "past the point of no return," through several degrees of preparation to jump down, to a forward lean of "between ten and twenty degrees." It is clear, in any case, that Troyer's center of gravity was outside the truck since the body fell to the ground and not into the bed of the dumptruck. It is also clear that Troyer was at least leaning forward much more than ten or twenty degrees: he was sitting on the tailgate, which was seven feet above the ground; Bangs is five feet eight inches tall and fired from in front of his face; and the bullet travelled slightly downward as it went through the body, entering at a point fourteen inches below the top of the head and coming to rest in the back about fifteen inches below the top of the head.

5. *Price v. State*, 437 P.2d 330, 334–35 (Alaska 1968), *quoting State v. Wolf*, 44 N.J. 176, 207 A.2d 670, 675–76 (1965), explicitly grants this discretion:

> If under our system of trials a jury is to be considered intelligent enough to be entrusted with powers of decision, it must be assumed they have sense enough to ask to have their memories stimulated or refreshed only as to those portions of the testimony about which they are in doubt or disagreement. It must be assumed also that if they had any similar doubts or disagreements about statements of other witnesses they would seek the same remedy. If they do not ask for further reading there is no right in a party to demand it. The matter must be left in the sensitive discretion of the trial judge. He may inquire if they wish to hear the testimony of [other witnesses], whether or not a party suggests it. But he should not burden a jury with unnecessary reading they do not indicate a need to hear, and it is not error to decline to read further portions of the evidence simply because a party so demands.

We note our agreement with the state's suggestion that in future cases some indication be placed on the record as exactly what testimony was replayed to the jury.

accorded to the trial judge in these matters, we find no merit in Bangs' assertion that the trial court erred in refusing to replay the cross-examination portions of Marie Lee's testimony.

During their deliberations, the jury encountered difficulty with the "specific intent" element of murder. Then the following written question was sent to the trial judge:

> If a man of sound memory and discretion purposely and with malice, deliberately and with premeditation, commits acts which would reasonably result in the death of another, need the specific intent, to wit, to kill be present to meet the requirements of first degree murder?[6]

Over defense counsel's objection, the trial judge simply answered, "yes." The trial court first made inquiry of the jury forelady whether "the clarification requested [was] merely as to first degree or as to second degree and first degree." The forelady's response was, "First degree is what we were considering (indiscernible portion of the tape)."

Bangs' argument is that since the jury appeared to be confused over the "specific intent" element of murder, they should have been instructed that "specific intent" is a necessary element of second degree murder as well as of first degree murder. The state counters by arguing that had the jury not been carefully reading the court's instructions they would not have discovered the apparent inconsistency between instructions numbered 3 and 9 and requested clarification as they did. The state further argues that it is reasonable to believe that the jury applied the court's answer to its specific intent inquiry to the court's instructions governing the essential elements of second degree murder.

■ We think the state's arguments are persuasive as to this specification of error. The superior court's second degree murder instructions informed the jury that they must find that the killing was "done purposely," and this term was defined as meaning "with a specific intent to kill."[7] We thus conclude that the superior court did not err in its handling of the jury's inquiry regarding the subject of specific intent.[8]

■ Bangs' next assertion is that the superior court erred in its rejection of his requested "imperfect self-defense instruc-

---

6. Instruction 3 reads, in pertinent part:
   The law assumes that every person intends the natural consequences of his voluntary acts. Therefore, the intent required to be proven as an element of a crime may be inferred from a defendant's voluntary commission of the act forbidden by law.
   Instruction 9 reads:
   Purpose is a decision of the mind to do an act with a conscious objective to produce a specific result. As used in these instructions 'purposely' means with a specific intent to kill.
   The purpose with which an act is done may be determined from the manner in which it is done, the means or weapon used and all other facts and circumstances shown by the evidence. If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the intent or purpose to kill may be inferred from the use of the weapon.
   An intent or purpose to kill cannot be implied or inferred from the fact of killing alone.
   Motive is not an element of the crime charged and need not be shown. However,

you may consider motive or lack of motive as a circumstance in this case. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled.

7. In this regard, the state argues:
   The judge had already explained to the jury that this instruction took precedence over the language of Instruction 3, and the jury doubtlessly remembered that when they considered the issue of second-degree murder.

8. As part of his argument in support of this specification of error, Bangs contends that the superior court erred in refusing to poll the jury, upon their returning the verdict, as to the finding regarding the element of specific intent. We find no merit in this argument. In *Des Jardins v. State*, 551 P.2d 181, 190 (Alaska 1976), we noted that normally a verdict cannot be impeached for failure by the jury to consider certain elements in its deliberations but that "fraud, bribery, forcible coercion or any other obstruction of justice" are the grounds this court recognizes for impeachment.

tion." [9] This specification of error is disposed of by virtue of our recent opinion in *Houston v. State*, 602 P.2d 784 (Alaska, 1979), where this court rejected a parallel "imperfect self-defense instruction" argument. In the instant case, as in *Houston*, the superior court correctly advised the jury concerning the relevant law governing the elements of second degree murder and manslaughter. It follows that no error was committed by the superior court in its rejection of the requested instruction.

■ Bangs also contends that the superior court's failure to instruct the jury as to whether one has the obligation to retreat before employing deadly force in his own defense seriously prejudiced his argument that the homicide was committed in self-defense.[10] We hold that the superior court did not err for the following reasons. Our study of the record persuades us that, taking the view of the evidence most favorable to Bangs, he was not entitled to a self-defense instruction. In this regard, the Supreme Court of Maine, in *State v. Millett*, 273 A.2d 504, 510 (Me.1971), dealt with a case similar to the case at bar and determined that the accused was not entitled to any self-defense instruction.

We are satisfied that in a day of increasing resort to violence these are salutary rules indeed. The law of self-defense is designed to afford protection to one who is beset by an aggressor and confronted by a necessity not of his own making. It must not be so perverted as to justify a homicide which occurs in the course of a dispute provoked by the defendant at a time when he knows or ought reasonably to know that the encounter will result in mortal combat.

In the instant case the evidence bearing on self-defense and viewed in the light most favorable to the defendant fails to raise the issue for jury consideration. . . . The defendant entertained a grievance against Cooper . . . This grievance involved a claim for damages to property, trivial indeed when compared to the value of a human life. . . . [O]bviously anticipating that Cooper would resist his demand for restitution, the defendant procured a gun for the sole purpose of going armed to the encounter he sought with Cooper. . . The law cannot give its sanction to the settling of disputes by the use of deadly weapons.

Given our evaluation that Bangs was not entitled to any self-defense instruction, we hold that the omission on the superior court's part to give such an instruction was not error.[11]

9. The imperfect self-defense instruction requested by Bangs was as follows:

However, if you find that the defendant did not have reasonable grounds to believe that he was in imminent danger of death or serious bodily harm and that deadly force was necessary to repel such danger, the defendant is not necessarily guilty of second degree murder. If the defendant actually though unreasonably believed that he was in imminent danger of death or serious bodily harm and that deadly force was necessary to repel such danger, he is guilty of manslaughter. If you have a reasonable doubt about this actual belief, you must give the defendant the benefit of that doubt and find him guilty of manslaughter rather than second degree murder.

10. At trial defense counsel requested the court to instruct the jury as to the duty to retreat:

MR. BOYKO: Thank you sir. The only one which I could have liked to see given, Your Honor, and would [except] to its omission, is the one that says a person who is threatened with an attack that justifies the exercise of the right of self-defense, need not retreat. In the exercise of his right of self-defense he may stand his ground and defend himself by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar knowledge. This law applies even though the assailed person might have more easily gained safety by flight or by withdrawing from the scene.

11. The parties' briefs contain interesting and detailed argumentation as to the historical development of the law of self-defense and the rules relating to the duty to retreat in the context of a self-defense situation. Our disposition of the issue before us in this appeal has made it unnecessary to directly address the self-defense retreat issues so ably briefed by counsel for the parties to this appeal.

Bangs' final point in this appeal is that his sentence to fifteen years imprisonment is excessive. We have carefully reviewed the record in light of Bangs' contention and have concluded that the superior court was not clearly mistaken in imposing the sentence it selected. Given the seriousness of the offense and the circumstances surrounding its occurrence, we hold that the superior court sentence is not excessive.

Affirmed.

BOOCHEVER and BURKE, JJ., not participating.