**Adam PAUL, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 5698.**

Court of Appeals of Alaska.

Nov. 19, 1982.

Dana Fabe, Public Defender, Anchorage, for appellant.

Charles M. Merriner, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

■ Adam Paul appeals to this court from his conviction of first-degree murder. Paul challenges the trial court's failure to submit the issue of self-defense to the jury. In determining whether the jury should have been instructed on self-defense, we must construe the evidence in the light most favorable to the accused. *Bangs v. State,* 608 P.2d 1 (Alaska 1980); *Toomey v. State,* 581 P.2d 1124 (Alaska 1978). Accordingly, we will summarize the relevant evidence favorable to Adam Paul's claim of self-defense.

In September, 1979, Adam Paul, who was eighteen years of age, resided near the Yukon River in the small village of Emmonak, where he had grown up. In late August or early September, 1979, Adam Paul had moved into a house in the village occupied by his older brother, Anthony.[1] The house, a small, single story dwelling with a metal roof and plastic-covered windows, measured approximately twenty-eight by twenty feet.

On the evening of September 15, 1979, Anthony decided to have a party at the house. He began drinking "home brew" early in the evening and was joined by a number of people, including Adam. As the evening progressed, Anthony continued drinking. At about 10:00 p.m., everybody

---

1. For the sake of clarity, we will refer to Adam and Anthony Paul by their first names.

at the party except Adam left for the neighboring village of Alakanuk to find some marijuana. As Anthony departed, he handed Adam a pistol and told Adam to use it to threaten anyone who "messed around" while Anthony was gone. When Anthony and his companions returned a short while later (the group had not succeeded in finding any marijuana), Anthony demanded that Adam return the pistol. Adam would not return it, however, and consequently Anthony struck Adam with his fist, knocking Adam to the floor. A woman who was present at the party and saw Anthony hit Adam asked Adam why his brother had hit him. Adam told her, "It's okay, I'm used to it. He hits me all the time."

The party eventually broke up. After the guests had gone, Anthony again demanded his gun from Adam, and this time Adam complied. After obtaining possession of the gun, Anthony began to beat Adam and throw him around. The two men were in the bedroom of the house at the time. Anthony, intoxicated and in a vicious mood, accused Adam of having hated their oldest brother, Nelson, who had drowned in an accident three months earlier. Anthony repeatedly beat Adam with his fists, pausing occasionally to walk angrily around the house before returning to the bedroom to resume his assault. During the course of the assault, Adam became increasingly frightened. Anthony then turned his attention away from Adam. He pulled a shotgun off the wall of the house and began shooting at lightbulbs in the kitchen and firing through walls and windows. Eventually Anthony stopped shooting and reloaded the shotgun.

At about this time, Louis Shelton, who had previously been at the party, returned to the house to pick up a pair of shoes that he had forgotten. As he approached the house, Shelton heard shots. When Shelton arrived at the door, Anthony pointed the shotgun at him. Anthony told Shelton, "I could have blown your head off." Shelton saw Adam at that time and noted that Adam appeared to be frightened; Shelton indicated that he himself was afraid.

After Shelton's departure, Anthony attacked Adam once again. This beating was more severe than before and caused Adam to bleed from the nose. It was at this juncture that Anthony picked up the shotgun that he had previously fired and threw it at Adam, stating, "I should kill you." The gun hit Adam's chest and fell to the floor. Anthony commanded Adam to pick up the gun and kill him before he counted to three. Anthony warned that if Adam did not kill him by the count of three, he would take the gun and kill Adam. Both men were in the kitchen. Anthony stepped back from the kitchen to the living room and began to count slowly. Meanwhile, Adam picked up the shotgun and stood near the freezer in the kitchen, facing Anthony. Adam testified that he picked up the shotgun because he was afraid Anthony would kill him or beat him. Adam considered fleeing the house, but he was afraid an attempt to escape would only aggravate the situation, because he thought Anthony would pursue and kill him if he did manage to get out of the house. At that point, Anthony again ordered Adam to shoot him in the chest. Anthony repeatedly struck himself in the chest, indicating where Adam should shoot him. According to Adam's testimony, he finally decided to fire a shot over Anthony's shoulders in an effort to stop Anthony's tirade and to calm him down. Adam pulled the trigger, and Anthony fell to the floor. Anthony, struck in the region of his chin and neck, died of a wound to the right carotid artery.

Adam left the scene of the shooting and went to his parents' house. There, he unloaded the shotgun and placed it on a shelf. The following day, Adam reported the incident to the village police officer. While talking to the officer, Adam stated that he "wished it had never happened," that things might have been different if he had not been alone and so afraid of Anthony. Adam further told the officer that "it's not easy" to get away from such circumstances when you are alone and that it is a "helpless feeling to be so frightened of a brother." Finally, Adam told the village police officer that Anthony could easily have killed him if

he had not reacted in the way he did to Anthony's threat.

An investigation conducted by Alaska State Troopers provided information corroborating Adam's account of the killing. The troopers found numerous shotgun pellet holes in the ceiling, walls and window frames, large holes in the plastic covered windows, and a number of expended shotgun casings on the floor of the residence. An autopsy disclosed that Anthony's knuckles were freshly skinned and abraded, indicating that he had been beating something or someone with his fists shortly before his death. A trooper who saw Adam on the day after the shooting stated that he had a swollen face, a black and blue eye, and a bloody chin and chest.

Adam Paul's defense at trial was predicated on his assertion that he had not intended to shoot his brother Anthony and that he had fired the shotgun in self-defense. The trial court, however, refused to instruct Paul's jury on self-defense. The court ruled that Adam Paul had presented sufficient evidence to indicate a subjective belief on his part that it was necessary to fire the shotgun in self-defense. However, the court concluded that the evidence would not support an objective finding of reasonableness on Adam Paul's part. Thus, the court believed that, even if Adam Paul subjectively believed he was justified in acting in self-defense, a reasonable person would not have concluded that Adam Paul was in imminent danger at the time of the shooting.[2] Accordingly, the court concluded that the evidence did not merit a jury instruction on self-defense. We must determine whether this finding by the court was mistaken, under the circumstances.

It is well recognized that the burden is on the defendant to produce some evidence in support of a claim of self-defense before he will be entitled to a jury instruction. *Bangs v. State,* 608 P.2d 1, 5 (Alaska 1980); *Toomey v. State,* 581 P.2d 1124, 1126 (Alaska 1978); *Folger v. State,* 648 P.2d 111 (Alaska App.1982). The burden to produce some evidence of self-defense is not, however, a heavy one; this standard is satisfied when self-defense has fairly been called into issue. In each case, the relevant inquiry is, "did the evidence viewed in the light most favorable to the defendant, generate the issue of self-defense for jury consideration?" *State v. Millet,* 273 A.2d 504, 508 (Me.1971).[3] A jury question will be presented and an instruction required if the evidence, when viewed in the light most favorable to the accused, might arguably lead a juror to entertain a reasonable doubt as to the defendant's guilt.[4]

Because it is apparent that a colorable claim of self-defense must be resolved by the jury, along with other factual issues relevant to the determination of innocence or guilt, the role played by the trial court in deciding whether a self-defense instruction is called for must be a limited one. The court must be mindful of the need to re-

---

**2.** In denying Paul's request for a jury instruction on self-defense, the trial court stated:

> I think there is evidence that defendant had a fear of his brother. The fear is based on the physical altercations ... directed by Anthony against Adam, and the words and conduct with respect to the gun.
>
> On the other hand, ... at the time that the words were spoken, and the actions occurred, which ultimately led directly to Anthony's death, I don't think that a reasonable person would have had a fear of imminent danger, of death or great bodily harm occurring to that person.

**3.** *State v. Millet* was expressly relied upon by the Alaska Supreme Court for discussion of the "some evidence" standard in both *Bangs v.*

*State,* 608 P.2d 1, 5 (Alaska 1980), and *Toomey v. State,* 581 P.2d 1124, 1126 (Alaska 1978).

**4.** *See State v. Millet,* 273 A.2d at 508:

> When such evidence [of self-defense] is forthcoming the trial court must first, viewing that evidence in the light most favorable to the defendant, determine whether or not it is adequate to raise the self-defense issue, and, if believed, would under the legal tests applied to a claim of self-defense permit a reasonable doubt as to guilt, stemming from that claim, to arise. Having concluded as a matter of law that the self-defense issue is thus properly tendered, the trial court need only instruct the jury as to the elements of self-defense.

frain from adjudicating factual issues that fall within the jury's domain. Application of too severe a standard in determining whether "some evidence" of self-defense has been presented will inevitably place the court in jeopardy of encroaching on the prerogative of the jury and, to that extent, impinging on the right of the accused to a jury trial. It is for this reason that the trial court must view the evidence in the light most favorable to the accused in deciding if sufficient evidence to instruct on self-defense has been presented. The same reason has led to the rule that, when a court considers whether the "some evidence" standard has been met, "[a]ny weakness or implausibility in the evidence supporting [the accused's] story is not a relevant consideration." *Toomey v. State,* 581 P.2d at 1126 n. 10. Thus, in determining whether "some evidence" of self-defense has been presented, the court is not called upon to determine the credibility or strength of the evidence or the weight to be given to testimony. *Id.* at 1126 n. 6.[5]

A review of the facts involved in three cases where evidence was deemed sufficient to require a self-defense instruction is helpful in illustrating the types of cases in which "some evidence" of self-defense has been found to exist. In *Toomey v. State,* relatively little evidence of self-defense was held to meet the standard requiring an instruction to be given. Although the facts were contested, the supreme court examined Toomey's version of the events in order to determine whether self-defense was an issue. 581 P.2d at 1125. Toomey and two of his friends had been drinking in a bar; they became involved in a fight and were evicted from the premises. Shortly thereafter, one of the friends re-entered the bar. When his friend did not emerge, Toomey returned to the bar and was kicked, beaten, and evicted once again. Toomey found a car idling in the parking lot, drove it to his brother's house, obtained two handguns and drove back to the bar. As Toomey was parking the car, the owner of the car and two of her friends appeared, demanding that Toomey get out of the car. During this confrontation, the owner of the car grabbed Toomey's parka and entered the car. When one of the owner's friends raised a poolstick or poolstick case, and the other friend moved in toward Toomey, Toomey pulled a gun and ordered them to "hold it." He then ordered the owner out of the car, got into it himself, and drove off. Despite the fact that the state's witnesses indicated that Toomey had not been threatened and that the only object carried by the two men was an empty pool cue case, the supreme court held that the evidence justified a self-defense instruction. *Toomey v. State,* 581 P.2d at 1126.

A case relied upon by the court in *Toomey* was *State v. Hickman,* 21 N.C.App. 421, 204 S.E.2d 718, 719 (1974). Hickman stabbed a person during a card game, causing serious injury; he testified that he thought his victim had come at him with something in his hand, but the state's evidence showed that the attack was unprovoked. Despite the strength of the state's evidence and the purely subjective nature of Hickman's belief that he was being attacked with a knife, the court in *Hickman* held that the claim of self-defense was supported by sufficient evidence to warrant an instruction.[6]

The more recent ruling in *Commonwealth v. Schaller,* 493 Pa. 426, 426 A.2d 1090, 1096–97 (1981), provides another example of the low quantum of proof necessary to justify a jury instruction on self-defense.

---

**5.** The court in *Toomey* relied upon a portion of Justice Rabinowitz' dissenting opinion in *Wilson v. State,* 473 P.2d 633 (Alaska 1970). The dissenting opinion stated, in part:

Where there is evidentiary support for special facts sustaining a rational defensive theory, to which the court's attention is specifically directed, the defendant is entitled to have the jury charged on that theory. However weak the evidence, however implausible the theory may appear to be, the matter is for the jury's determination.

*Id.* at 638 (Rabinowitz, J., dissenting, quoting *Brooke v. United States,* 385 F.2d 279, 284 (D.C.Cir.1967)).

**6.** A similar result was reached under analogous circumstances in *State v. Todd,* 264 N.C. 524, 142 S.E.2d 154, 159 (1965).

Schaller had been ejected from a bar and was sitting outside on his motorcycle when a person inside the bar started pounding on the window. As the person moved from the window toward the door of the bar, Schaller pulled a gun. When the person, who was unarmed, emerged from the bar, Schaller yelled, "I don't know you, I don't want any trouble." The person continued to walk toward Schaller, who took aim with his gun, then shot and killed the person. At trial, Schaller testified that he had feared injury and had acted to protect himself when he fired. He further testified that he had intended only to fire a warning or disabling shot. The court in *Schaller* held that, under these circumstances, self-defense was properly an issue to be decided by the jury and an instruction on self-defense was necessary.[7]

We believe that the evidence of self-defense in the present case is at least as compelling as that which was held to satisfy the "some evidence" standard in *Toomey, Hickman,* and *Schaller.* Here, there was substantial and uncontroverted evidence that Adam Paul had been assaulted and physically abused by his older brother, Anthony, that the abuse had gotten progressively more violent, that Anthony was intoxicated and had repeatedly fired his shotgun in anger while inside his house, that Anthony had made a veiled threat to Louis Shelton with the shotgun and had caused Shelton to become frightened, and that Anthony threatened to kill Adam if Adam did not shoot him first.

The state maintains, nonetheless, that the trial judge correctly refused to instruct on self-defense based on his conclusion that a reasonable person would not have had a fear of imminent danger of death or great bodily harm under the circumstances. To be sure, before the use of deadly force in self-defense can be justified, circumstances must be sufficient to warrant a reasonable belief on the part of the ac-

cused that there exists an imminent danger of death or serious physical injury. However, when the record in the present case is viewed in the light most favorable to the defense, there is, we believe, at least some evidence presented to support a conclusion that Anthony Paul posed an imminent danger of death or serious physical injury at the time Adam Paul fired the shot that killed Anthony.

Adam Paul's testimony was that Anthony threw the shotgun at Adam and threatened to kill him if Adam did not shoot Anthony before Anthony finished counting. Thus, according to Adam Paul's testimony, Anthony's verbal threat was direct and immediate. The repeated discharge of the shotgun by Anthony inside his house, Anthony's veiled threat to Louis Shelton, his severe physical abuse of Adam, and Anthony's spiteful accusation that Adam had hated their deceased brother are all circumstances which, if found to be true, might be taken to indicate that Anthony Paul's threat to kill Adam was made in earnest. As the state correctly observes, there are ample indications that Adam Paul might not have been in imminent danger and that it would have been unreasonable for him to believe that he was in imminent danger. Adam Paul had control of the shotgun, and it might have been possible for him to avoid all danger by retaining the gun and leaving the house to seek safety elsewhere. However, resolution of the issue of imminent danger would, in this regard, hinge on the question of whether the option of leaving his house was a reasonable one for Adam under all the facts in evidence. There was substantial evidence presented on this issue which, if believed, might support the conclusion that Adam Paul could not have escaped imminent danger from his brother by attempting to leave the house.

Adam Paul testified that it would have been useless for him to try to leave the house, since he was convinced that Anthony

7. *See also Houston v. State,* 602 P.2d 784 (Alaska 1979) (defendant's uncorroborated testimony that he thought his victim—whom he did not know and with whom he had no prior contact—was about to reach for a gun after a brief verbal dispute raised a substantial claim of self-defense).

Paul would pursue and kill him. Admittedly, this testimony might be construed to indicate no more than a belief by Adam Paul that his brother Anthony might eventually seek him out and try to kill him if Adam Paul left the house with the shotgun. Yet the testimony is also subject to the interpretation that Adam Paul believed it was futile to attempt leaving the house with the shotgun because Anthony Paul would have been capable either of stopping Adam and killing him before he managed to leave or of pursuing him and killing him before he could find help. The plausibility of this latter interpretation is reinforced by the immediate nature of Anthony's verbal threat to kill Adam, Anthony's physical domination over Adam throughout the night, the small size of the house, and the presence of guns other than the shotgun.

▮ On balance, we believe that Adam Paul met the burden of producing at least some evidence to establish the existence of an imminent danger of death or serious physical injury as a result of Anthony Paul's conduct. This burden having once been met, the reasonableness of Adam Paul's belief that he was in danger properly became an issue to be addressed by the jury in its deliberations. Whether, under all of the attendant circumstances, a reasonable person would have entertained a fear of imminent danger of death or serious physical injury was a factual question and, as such, one that the trial court could not correctly resolve in the jury's stead.[8] "[T]he jury should [decide] the reasonableness of appellant's belief...." *Schaller v. State*, 426 A.2d at 1097. Particularly because reasonableness is a factual question closely allied with considerations involving the credibility of witnesses and the weight to be given to their testimony, trial courts must avoid basing decisions as to the necessity of self-defense instructions on an evaluation of the reasonableness of defendants' conduct. As held in *State v. Lockett*, 82 Ill.2d 546, 45 Ill.Dec. 900, 904, 413 N.E.2d 378, 382 (1980): "It is not the province of the judge to weigh the evidence and decide if defendant's subjective belief was reasonable or unreasonable...." *See also State v. Spaulding*, 298 N.C. 149, 257 S.E.2d 391 (1979).

▮ We conclude that the trial court committed error in refusing to grant Adam Paul's request for a jury instruction on the issue of self-defense.[9] In this case, Paul

---

**8.** This is not to say that self-defense instructions cannot be rejected by the court where there is some evidence that the defendant acted to defend himself, but no evidence of imminent peril. An example of circumstances under which self-defense instructions might be denied based on lack of imminent peril may be found in "battered wife syndrome" homicides. Typically, these cases involve a battered wife who kills her husband in his sleep. Although in such instances there is commonly ample evidence to support a finding that the killing was motivated by fear and that the fear may have been as real and as urgent at the time of the killing as it was when the husband was awake and actually capable of immediate physical abuse, cases have uniformly refused to apply self-defense to this category of crime. The basis for refusal has been lack of an immediate threat of harm. *See* Comment, *The Battered Spouse Syndrome as a Defense to a Homicide Charge Under the Pennsylvania Crimes Code*, 26 Vill.L.Rev. 105, 132–33 (1980). The state attempts to analogize such cases to the circumstances presented in the case at bar. The analogy, however, is not appropriate. In the cases dealing with "battered wife syndrome" killings, the uncontroverted facts establish the lack of any immediate danger, hence justifying refusal to instruct on self-defense. In the present case, by contrast, some evidence of imminent danger was presented. The reasonableness of the defendant's belief as to immediacy of the danger must thus be evaluated by the jury.

**9.** In *Folger v. State*, 648 P.2d 111 (Alaska App. 1982), despite relatively weak evidence of self-defense, we recently found that it was error to refuse a self-defense instruction. In so holding, we noted that, as a matter of policy, there should be a preference for giving self-defense instructions in close or marginal cases:

We think a strong argument can be made that a trial judge should err on the side of giving instructions on self-defense so as to avoid a needless appellate issue in cases in which a weak case for self-defense is presented. We also think that in a case such as this where self-defense is presented as a possible defense, there is a danger that the jury may consider its own understanding of what self-defense is in the absence of an instruction from the court. It seems preferable to have the jury correctly instructed. 648 P.2d at 114 n. 3.

satisfied the burden of producing "some evidence" that he had acted in self-defense. An instruction on this issue was therefore necessary.[10]

The conviction is REVERSED, and this case is REMANDED for a new trial consistent herewith.

**10.** Given our decision to reverse the conviction and remand for a new trial, we need not address the sentencing issues argued by Paul. Paul has raised a number of additional issues, however, one of which we must consider despite our decision to reverse, and others which we believe should be considered because of the likelihood that they will recur upon retrial. These issues, and our disposition of them, are as follows:

(a) *Sufficiency of Evidence.* Paul argues that the evidence presented at his trial was insufficient to permit a finding of premeditation, a necessary element of first degree murder under former AS 11.15.010; thus, Paul urges that his motion for judgment of acquittal as to first degree murder should have been granted. A review of the record convinces us that the evidence in the record, when viewed in the light most favorable to the state, was ample to give rise to an inference of premeditation. Paul's motion for judgment of acquittal was properly denied.

(b) *"Imperfect" Self-Defense Instruction.* Paul asserts that the trial court committed error in refusing to instruct the jury on "imperfect" self-defense. We find no merit to Paul's claim. *Bangs v. State,* 608 P.2d 1, 4–5 (Alaska 1980); *Houston v. State,* 602 P.2d 784, 796 (Alaska 1979).

(c) *Prior Instances of Violent Conduct.* Paul has argued that the trial court committed error in refusing to admit evidence of specific instances of Anthony Paul's violent conduct. The superior court made admissibility of such evidence contingent on a showing that Adam Paul, at the time of the shooting, was actually thinking of the prior violent episodes committed by Anthony Paul. We hold the trial court's ruling was erroneous. The admissibility of the evidence of prior violent conduct should not have been predicated on the subjective thought processes of Adam Paul at the time of the shooting. No such requirement has traditionally been imposed. *United States v. Burks,* 470 F.2d 432 (D.C.Cir.1972); *Loesche v. State,* 620 P.2d 646 (Alaska 1980); *McCormick on Evidence* § 193, at 461 (E. Cleary ed., 2d ed. 1972). Assuming the same evidence is offered by Paul on retrial, it should be admitted.

(d) *Bifurcation.* Paul contends that the trial court erred in refusing to allow separate trials to determine the issues of self-defense and diminished capacity. We note that the untimely manner in which Paul's motion was originally filed would alone have justified its denial. In any event, we hold that, under the circumstances of the present case, where the defense of diminished capacity is based only upon intoxication and where evidence of intoxication would be relevant and admissible to the issue of self-defense, bifurcation is not required, even assuming it might be required in some instances.