**Elijah J. BROWN, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–93.**

Court of Appeals of Alaska.

April 26, 1985.

Mary E. Greene, Asst. Public Defender, Fairbanks, and Dana Fabe, Public Defender, Anchorage, for appellant.

Cynthia M. Hora, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

**672**

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

### OPINION *

BRYNER, Chief Judge.

Elijah J. Brown was convicted, after a jury trial, of assault in the first degree. AS 11.41.200(a)(1). Superior Court Judge Jay Hodges sentenced Brown to a presumptive term of six years' imprisonment. Brown appeals, contending that the trial court committed plain error in instructing the jury that the defendant bore the burden of proving self-defense.[1] We reverse.

Elijah J. Brown was convicted of assaulting his friend of thirty years, E.M. Miller. Their friendship had apparently disintegrated, due in part to Miller's friendship with Brown's wife. Brown and his wife had been separated for three years when Brown went to his wife's apartment at around 6:00 p.m. on November 4, 1982, to deliver some mail to his daughter. Brown became upset when he discovered his wife and Miller together in his wife's living room. A short argument ensued.

There was conflicting testimony as to whether Miller threatened Brown. Brown claimed that Miller threatened him with a .44 magnum handgun; Miller denied this claim. In any event, Brown left the apartment and Miller went to a private club known as "the party house." It is undisputed that Miller had a .44 magnum in his pocket at the party house. Brown testified that a short time after arguing with Miller,

he returned to his wife's apartment and argued with her until she asked him to leave. Brown went home, decided that he had to go talk to Miller again and, after arming himself with a .22 rifle, took a cab to the party house.

Although Brown and Miller gave different versions of what happened inside the party house, they agreed that Brown entered carrying his rifle while Miller was standing at the bar and that Brown, after saying something to Miller, fired his rifle, shooting Miller in the chest. Miller responded, firing one round from his handgun before it jammed, and Brown fired a second shot into the ceiling. Brown and Miller then struggled with one another until they were separated.

At trial, Miller testified that Brown shot him without provocation. In contrast, Brown testified that he entered the party house, approached Miller without pointing the rifle at him, and told Miller he wanted to talk. According to Brown, after he and Miller had spoken for about a minute, Miller turned as if to walk away, then suddenly turned back. When Miller turned back toward Brown, his coat was open and he held the .44 magnum, lowering it at Brown. In response to Miller's action, Brown raised his rifle and managed to fire a shot at Miller just before Miller fired at Brown. Brown repeatedly testified that he had only intended to talk to Miller and that he fired only in self-defense.[2]

* Entered pursuant to Appellate Rule 214 and Guidelines for Publication of Court of Appeals Decisions (Court of Appeals Order No. 3).

1. Brown also argues that the court erred in denying his request for a continuance and that the sentence he received is excessive. Our disposition of Brown's self-defense claim makes it unnecessary to consider these issues.

2. A review of the record indicates that Brown consistently claimed his sole purpose in approaching Miller at the party house was to talk about Miller's prior threats. For example, Brown testified at one point:

Q: What effect did it [Miller's prior display of his .44 magnum to Brown at Brown's wife's house] have?
A: It affected me to the point where I just had made up my mind I wasn't going to let

him run over me anymore and that was it. He was going to have to tell me why he was doing this or look—we could talk it over and forget about it, because I definitely had never been bothering him or interfered in his married life or no other life of his.

\* \* \* \* \* \*

Q: Why did you take your rifle with you?
A: Because I wanted to talk to Mr. Miller. And I knew that Mr. Miller was armed. I knew he was armed, but yet I wanted to talk to him. So I was a little bit—I was afraid of going just barehanded. It's the only way I can go....
Q: Did you intend to shoot anyone with that gun whenever you left?
A: My intention was not to shoot anyone....
Similarly, Brown's testimony concerning the manner in which he approached Miller after

In addressing this defense during closing arguments to the jury, the prosecution stated:

> If you find that there is self-defense in this case and it's a meritorious defense and you find so by the preponderance of the evidence, that it is a meritorious defense, then [Brown]'s not guilty of anything because self-defense ... applies to all four [degrees of assault].

Brown did not object to this argument. The trial court then gave two jury instructions dealing with the issue of self-defense. In its initial instruction the court told the jury that the defendant bears the burden of proof on the issue of self-defense. Jury Instruction 13 provided, in relevant part:

> I have previously instructed you that the State always bears the burden of proving the defendant's guilt beyond a reasonable doubt. However, in this case the defendant has asserted the defense of self-defense, which is an affirmative defense. As to that defense only the defendant must bear the burden of proof, about which I will instruct you more fully.

The court's next instruction, Jury Instruction 14, dealt with the use of deadly force and concluded that, "unless the State has proven beyond a reasonable doubt that the defendant did not act in self-defense, you must find the defendant not guilty." Although Jury Instruction 13 improperly shifted the burden of proof on the issue of self-defense and conflicted with Jury Instruction 14, Brown failed to object to it.

On appeal, Brown argues that Instruction 13 constituted plain error. *See Crutchfield v. State*, 627 P.2d 196, 198 (Alaska 1980); Alaska R.Crim.P. 47(b). The state acknowledges that the instruc-

tion was an incorrect statement of the law but maintains that it did not amount to plain error because, as a matter of law, Brown was not entitled to assert self-defense. Relying on *Bangs v. State*, 608 P.2d 1, 5 (Alaska 1980), the state claims that Brown became an initial aggressor and forfeited his right to claim self-defense when he armed himself and sought to confront Miller. *See* AS 11.81.335(a)(1), AS 11.81.330(a)(3). The state maintains that, since as a matter of law Brown was not entitled to any self-defense instruction, he could not have suffered prejudice from the incorrect self-defense instruction.

In *Bangs*, a heated exchange took place between Bangs and his eventual victim, Troyer, during which Troyer grabbed Bangs and attempted to choke him. Bangs escaped, walked rapidly to his nearby trailer, grabbed a loaded revolver and returned to the scene of the struggle. Bangs testified that he pointed his gun at Troyer, cocked it, and challenged Troyer to "come on." When Troyer lunged at him, Bangs shot. The Alaska Supreme Court, relying on *State v. Millett*, 273 A.2d 504, 510 (Me. 1971), held that even when the evidence was viewed in the light most favorable to Bangs, he was not entitled to a self-defense instruction, because he had been the initial aggressor.

■ We do not believe the holding in *Bangs* to be dispositive in the present case. A defendant in a criminal case is entitled to a jury instruction as to his theory of the case if there is some evidence to support it. *Toomey v. State*, 581 P.2d 1124, 1126 (Alaska 1978); *Paul v. State*, 655 P.2d 772, 775 (Alaska App.1982); *Folger v. State*, 648 P.2d 111, 113 (Alaska App.1982). In the present case, if there was some evidence

---

entering the party house clearly indicates that he sought only to speak with Miller:

> When I arrived in the party house, I walked in, Miller was standing up right at the bar. Assume this is the bar, like I am now. When I entered the door and I said, "Miller, I'd like to talk to you?" he said, "What do you want to talk to me about." I said, "Well I think we should talk about this whole incident that just happened, why you pulled your gun or whatever I did to you."

Thus, Brown expressly denied that he had any intent to harm Miller at the time he entered the party house and he never indicated expressly or impliedly that he expected a violent confrontation with Miller to result from their meeting or that he carried his gun in order to provoke a violent confrontation. To the contrary, Brown's testimony, if believed, would support an inference that Brown feared a violent confrontation if he sought to talk with Miller *without* arming himself.

presented at trial to support the conclusion that Brown was not an initial aggressor, then he was entitled to have the jury instructed on self-defense. In both *Bangs* and *Millett* undisputed evidence established that the defendants, anticipating resistance, procured guns for the sole purpose of armed confrontation with their intended victims. *Bangs*, 608 P.2d at 5. Both defendants, after arming themselves, challenged their victims to physical combat with the apparent purpose of provoking a response. Under these circumstances both were found to be initial aggressors as a matter of law. By contrast, in this case there was evidence that Brown was not an initial aggressor—that he did not confront Miller to seek combat or challenge Miller for the purpose of provoking a physical response. Brown testified that when he entered the party house he intended only to talk to Miller, that he communicated that intent, and that he first raised his .22 rifle when Miller drew his own gun.

*Bangs* does not deprive a defendant of the right generally recognized at common law to "seek his adversary for the purpose of a peaceful solution as to their differences." *Hunter v. State*, 137 Tex.Cr.R. 289, 128 S.W.2d 1176, 1181 (1939) (on motion for rehearing). As noted in *State v. Bristol*, 53 Wyo. 304, 84 P.2d 757, 765 (1938),

> [N]either the fact of arming himself, nor the fact of going to the restaurant, even if he knew that the [victim] was there, was sufficient to deprive the defendant of the right of self-defense. The criterion is as to what he then did or said when he found the [victim], and whether what he said or did was reasonably calculated to cause the [victim] to be provoked into attacking the defendant.

*Accord State v. Starks*, 627 P.2d 88, 91 (Utah 1981); *State v. Jackson*, 94 Ariz. 117, 382 P.2d 229, 232–33 (Ariz.1963); *Gunther v. State*, 228 Md. 404, 179 A.2d 880, 882

(1962); *State v. Evans*, 124 Mo. 397, 28 S.W. 8, 11 (1894).

Thus, in determining whether Brown was a first aggressor, the crucial inquiry is not whether he was armed when he went to meet with Miller; rather, it is whether his assault occurred "in the course of a dispute provoked by the defendant at a time when he [knew] or ought reasonably to [have known] that the encounter [would] result in mortal combat." *State v. Millett*, 273 A.2d at 510. This is an inquiry that must be resolved in light of the totality of the evidence presented at trial.

While it is only Brown's own testimony which supports his theory that he entered the party house in a non-aggressive manner with the sole intention of conversing with Miller, the burden to produce some evidence is not a heavy one. *See Paul v. State*, 655 P.2d 772, 775–77 (Alaska App.1982). Viewing the evidence in the light most favorable to Brown, we believe that there is some evidence that Brown did not provoke a dispute with Miller under circumstances that he knew or should have known would result in mortal combat. Brown was therefore entitled to have his self-defense claim—weak as it may have been[3]—properly determined by the jury.

The law is well settled in Alaska that once some evidence places self-defense in issue, the state has the burden of disproving the existence of the defense beyond a reasonable doubt. AS 11.81.-900(b)(15); *Weston v. State*, 682 P.2d 1119, 1121 (Alaska 1984). In Jury Instruction 13 the trial court incorrectly placed the burden of proof for self-defense upon Brown. As the state acknowledges, this instruction is erroneous, since it raises the possibility that the jury might view it as shifting the burden of proof on a closely contested issue. *Carman v. State*, 602 P.2d 1255, 1259–60 (Alaska 1979); *Howard v. State*, 583 P.2d 827, 833 (Alaska 1978). *Cf. Bidwell v. State*, 656 P.2d 592, 596 (Alaska App.1983) (instruction did not shift burden of proof and was therefore not plain error).

---

**3.** Any weakness or implausibility in the defendant's story is not a relevant consideration in determining whether the "some evidence" standard has been met. *Toomey v. State*, 581 P.2d 1124, 1126 n. 10 (Alaska 1978); *Paul v. State*, 655 P.2d 772, 776 (Alaska App.1982).

Particularly in light of the prosecutor's final argument, which asserted that the jury was required to find self-defense by a preponderance of the evidence, the error cannot be dismissed as insubstantial. Nor is the error cured by Jury Instruction 14, which provided that the state was required to disprove self-defense beyond a reasonable doubt. Which of these conflicting instructions was actually relied upon by the jury is a matter of pure conjecture, and it is impossible to say with any degree of assurance that the appropriate standard was used.

We conclude that the instruction misallocating the burden of proof on self-defense was obviously prejudicial in that it cannot fairly be said that the error did not appreciably affect the jury's verdict. *Van Hatten v. State*, 666 P.2d 1047, 1057 (Alaska App. 1983). Giving the instruction, therefore, amounted to plain error. *See Stork v. State*, 559 P.2d 99, 101 (Alaska 1977).

The conviction is REVERSED.

SINGLETON, J., concurs and dissents.

SINGLETON, Judge, concurring and dissenting.

I join in the majority's decision that instructing the jury that Brown had the burden of proving self-defense by a preponderance of the evidence constituted an obvious error which, if prejudicial, would be plain error and require reversal of Brown's conviction. Under the circumstances, I would find no prejudice since the undisputed facts preclude, in my view, any instruction on self-defense.

My disagreement with the majority turns on a question of law not fact. The majority errs, in my view, in considering in isolation Brown's confrontation with Miller at the party house in determining whether Brown established some evidence that he acted in self-defense. In my view, this question cannot be answered without considering preceding events. When we consider all of the undisputed evidence construed most favorably to Brown, I am satisfied that Brown was not entitled to an instruction on self-defense and that, consequently, the instructional error did not prejudice him. I would hold as a matter of policy that the statutory duty to retreat before resorting to deadly force precludes an assailant from arming himself and seeking out his ultimate victim where he fears a violent confrontation, *i.e.*, he is aware [1] of a substantial risk that a confrontation will be likely to result in the necessity that he use

1. I am not suggesting a negligence standard. In essence, I would require some evidence that Brown was not "reckless" in seeking out his ultimate victim as that term is defined in AS 11.81.900(a)(3) before I would allow that issue of the use of deadly force in self-defense to go to the jury. If there was some evidence that Brown did not appreciate the risk that his actions in seeking Miller to continue the confrontation would result in a gun fight, then Brown's duty to retreat would be a jury issue and the burden would be on the state to disprove self-defense beyond reasonable doubt.

Alaska Statute 11.81.900(a)(3) provides:
*Definitions.* (a) For purposes of this title, unless the context requires otherwise,

. . . . .

(3) a person acts "recklessly" with respect to a result or to a circumstance described by a provision of law defining an offense when the person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists; the risk must be of such a nature and degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation; a person who is unaware of a risk of which the person would have been aware had that person not been intoxicated acts recklessly with respect to that risk;

I believe this application of the rules requiring retreat to the facts of this case is implicit in the statute and does not involve judicial legislation. On three occasions, the supreme court has followed similar reasoning—that the law should not be interpreted to encourage people to engage in violent confrontations—to a similar result—restrictions on the availability of related defenses. *See Bangs v. State*, 608 P.2d 1 (Alaska 1980) (person who leaves fight, arms himself, and returns becomes "initial aggressor" forfeiting right to self-defense); *Gray v. State*, 463 P.2d 897, 909 (Alaska 1970) (person who commits armed robbery forfeits right to claim self-defense against police or victim's use of deadly force so long as robbery is in progress); *Miller v. State*, 462 P.2d 421, 426–27 (Alaska 1969) (rejecting majority rule permitting use of force to repeal peaceful but illegal arrest). The following language from *Miller* is particularly apt:

deadly force in self-defense. In my view, Brown's testimony establishes three factors that preclude an issue of self-defense in this case: (1) that he knew Miller had threatened to kill Brown with a gun, (2) that he intentionally armed himself fearing a violent confrontation, and (3) that he intentionally sought Miller out to "discuss" Miller's threat. In my view, AS 11.81.-335(b) is dispositive of this question. It provides:

(b) A person may not use deadly force under this section if the person knows that, with complete personal safety and with complete safety as to others, the person can avoid the necessity of using deadly force by retreating, except there is no duty to retreat if the person is

(1) on premises which he owns or leases and the person is not the initial aggressor; or

(2) a peace officer acting within the scope and authority of the officer's employment or a person assisting a peace officer under AS 11.81.380.

The shooting in this case took place in a bar that was not owned or leased to Brown. Brown was not acting as or on behalf of a peace officer at the time. Consequently, in order to present a question of self-defense to the jury, Brown was obligated to produce "some evidence" that he had attempted to retreat and thereby avoid his ultimate victim at the point when Brown reasonably became aware of the potential threat to his life and the possibility that he might have to resort to deadly force in self-defense. It seems to me the facts set out in Brown's brief establish that he recognized the potential need for deadly force in self-defense long before he entered the "party house" but did not avoid Miller at that point, though he could easily have done so. Brown sets out the facts as follows:

On November 4, 1982, around 6:00 p.m., E.J. went to Mary's apartment to deliver some mail to his daughter Linda. He gave her the mail and saw Miller [his ultimate victim] and Mary [his wife] close together on adjoining couches. He had not noticed Miller's truck outside and was not expecting to see Miller there. E.J. asked what was going on and stated that Mary and Miller were the last people he expected to see so close together. Mary began yelling and Miller said he would leave. E.J. told him not to leave since E.J. was headed home. E.J. left and Miller followed him out. Miller pulled on E.J.'s sleeve; when E.J. turned, Miller put his hand on a .44 magnum in a holster beneath his parka. Miller threatened to blow E.J.'s "brains out" if he did anything. E.J. told Miller to take his hands off him and left.

After awhile, E.J. returned to Mary's apartment, determined to get to the bottom of the whole affair. Mary and E.J. argued and she told him to get out and not come back. Mr. Brown informed her that he was going to do just that.

Mr. Brown returned to his house. He decided that Miller's threat was too much and that he wanted and needed to talk to Miller. Because he knew that Miller was armed with a .44 pistol, E.J. took his .22 rifle with him. Mr. Brown took a cab to within a block of the party house. Although he did not know that Miller would be there, E.J. was afraid of what would happen if Miller saw him get out of the cab in front of the party house. Mr. Brown put two rounds in the rifle after he got out of the cab.

When E.J. walked into the party house, Miller was standing at the bar very close to the door. E.J. told him that he wanted to talk to him about threatening him with the gun earlier. E.J.'s rifle was held in his left arm. When E.J. told Miller that he wanted to talk with him, Miller asked what he wanted to talk about. E.J. re-

The control of man's destructive and aggressive impulses is one of the great unsolved problems of our society. Our rules of law should discourage the unnecessary use of physical force between man and man. Any rule which promotes rather than inhibits violence should be re-examined. Along with increased sensitivity to the rights of the criminally accused there should be a corresponding awareness of our need to develop rules which facilitate decent and peaceful behavior by all. 462 P.2d at 426.

sponded that he thought they should talk about Miller's threat and why he had "pulled a gun" on E.J.. Miller took a partial step, pulled his .44 magnum and pointed it at Mr. Brown. Mr. Brown fired first, striking Miller in the chest. Miller shot at E.J., barely missing his head. Mr. Brown fired a second shot into the ceiling. Mr. Brown and Miller then struggled over Miller's gun which had live ammunition remaining. The struggle went outside where Brown was able to disarm Miller and kicked the .44 away. Leon Miller, E.M. Miller's brother, and Tyrone Burkhead, a patron of the party house, separated them.

Citations to the record and footnote omitted.

Even if we construe the record most favorably to Brown, it is clear that he realized that Miller presented a substantial threat of physical violence at the time of their first confrontation at Brown's wife's home. Nevertheless, Brown went to his own home, armed himself with a rifle, and sought Miller out to "talk to him [Miller] about threatening him [Brown] with a gun earlier." Under these circumstances, Brown's testimony establishes his recklessness. Brown therefore failed to establish some evidence that he attempted to retreat at the earliest practicable time as a matter of law and, in my view, forfeited any right to claim self-defense. *See Bangs v. State*, 608 P.2d 1 (Alaska 1980); *State v. Millett*, 273 A.2d 504, 510 (Me.1971). For this reason, I would not follow *State v. Jackson*, 382 P.2d 229 (Ariz.1963), and other cases which, in my view, encourage violence by authorizing the kind of conduct that Brown engaged in this case. Brown had a right to lead his life unobstructed by Miller. The fact that he knew Miller was armed and could be dangerous did not require Brown to hide in his room. If Brown feared Miller, Brown certainly could arm himself in order to go about his normal business so long as he did not intentionally seek Brown out. In my view, public policy precludes us from holding that Brown may arm himself with a rifle and seek out someone he has substantial reason to fear will shoot him in order to continue a confrontation.

I am not insensitive to Brown's predicament. Miller's threat to kill him no doubt hurt Brown's pride and may even have enraged him. To this extent, Brown's response was understandable. But on reflection, we should not give our approval to Brown's subsequent actions because to do so encourages extremely dangerous confrontations. Brown's testimony establishes that he went to the party house knowing that a violent confrontation was likely. His actions endangered every person present. It is fortunate that more people were not injured. I would hold that the statutory duty to retreat precludes a finding of self-defense where the assailant seeks out his victim, in the absence of some evidence that the assailant did not foresee a substantial risk that a necessity for deadly force would arise. I, therefore, dissent from the decision to reverse Brown's conviction.