**John A. RHAMES, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–5277.**

Court of Appeals of Alaska.

Nov. 9, 1995.

Hearing Denied Jan. 5, 1996.

Blair McCune, Assistant Public Defender, and John B. Salemi, Public Defender, Anchorage, for Appellant.

Cynthia L. Herren, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

*OPINION*

MANNHEIMER, Judge.

John A. Rhames appeals his convictions for attempted murder, AS 11.41.100(a), second-degree assault, AS 11.41.210(a), third-degree assault, AS 11.41.220(a), and first-degree burglary, AS 11.46.300(a). We affirm.

Rhames's convictions all arose from a single incident that occurred on September 16, 1988. Rhames and his estranged wife, Carrie, were in the final stages of a divorce proceeding. On the morning of September 16th, Carrie obtained a restraining order to keep Rhames away from her. That afternoon, Carrie visited the apartment of Charles Patrick to retrieve a television set that she had lent him. While she was at Patrick's apartment, Carrie telephoned Rhames to inform him that the court had issued the restraining order. Upon hearing that a restraining order had been issued, Rhames exclaimed, "What restraining order? A restraining order doesn't mean anything to me!"

Within minutes of this telephone conversation, Carrie observed Rhames's car pass by Patrick's apartment. A few minutes later, Rhames's car again drove in front of the apartment. When Carrie alerted Patrick that Rhames was outside, Patrick went to the front window to look out onto the street. Patrick saw Rhames pull his car into the apartment building parking lot and then drive up in front of Patrick's apartment.

Carrie dialed 911 and reported that Rhames was at the apartment in violation of the restraining order. Meanwhile, Rhames got out of his car. Patrick yelled to Rhames not to come into the apartment. In response, Rhames went to the rear of his car and knelt down behind the vehicle.

Carrie retrieved a .22 caliber pistol from her purse and handed it to Patrick, who was still standing at the window. At about this time, Rhames emerged from behind his car with a .38 revolver in his hand. He fired a shot from this weapon; the bullet struck the apartment building above Patrick's window, entering the upstairs apartment and shattering a large aquarium.

When Rhames began shooting, Patrick backed away from the window. Rhames continued to approach Patrick's apartment, and he climbed into the apartment through the window. As he came through the window, Rhames fired a second shot from his revolver. This bullet hit the living room wall and came to rest in a closet. Patrick and Carrie fled down a hallway toward the rear bedroom. As he ran, Patrick apparently dropped the .22 pistol.[1]

Rhames pursued Patrick and Carrie. He fired a third shot, this one hitting the ceiling in the hallway. Patrick and Carrie reached the bedroom, but Rhames forced his way in, firing two more shots as he did so. Rhames and Patrick struggled, while Carrie attempted to crawl under the bed.

Rhames was able to get Patrick down. Rhames pointed his .38 at Patrick and told him, "You're dead." Rhames then pulled the

---

1. Patrick had only a hazy memory of what he did with the gun. Carrie told the police that, after Rhames had left but before the police arrived, she found the gun on the living room floor and hid it. She later turned the weapon over to police.

trigger, but the gun did not fire.[2] Finding himself unable to shoot Patrick, Rhames ran from the rear bedroom toward the living room, where he attempted to leave the apartment through the window. Patrick chased Rhames and the two men again struggled. To make his escape, Rhames struck Patrick several times over the head with the revolver. Rhames then exited through the window and drove away.

A description of Rhames's car was relayed to police officers in the field, and Rhames was stopped a few minutes later. The police found the .38 revolver under the driver's seat of Rhames's car. Patrick was brought to the site of the stop, where he identified Rhames as the man who had assaulted him and Carrie Rhames.

At trial, Rhames conceded that he had committed burglary and assault. His sole defense was to the charge of attempted murder. Rhames contended that, when he aimed his weapon at Patrick in the bedroom, he had committed merely an assault, not an attempted murder. Rhames asserted that he had never intended to actually shoot Patrick, but had intended only to scare him. The jury rejected this defense.

On appeal, Rhames challenges his convictions on a number of grounds. First, Rhames contends that he was not brought to trial within the time limits of Alaska's speedy trial rule, Criminal Rule 45. Under the version of Rule 45 in effect at the time of Rhames's prosecution, the speedy trial "clock" began to run on September 17, 1988 (the day following Rhames's arrest). Rhames was brought to trial 131 days later, on January 25, 1989.

■ Generally speaking, Criminal Rule 45 directs that a criminal defendant must be brought to trial within 120 days. However, the rule also directs that several time periods be excluded from this 120-day calculation. One of these exclusions is for any "period of delay resulting from an adjournment or continuance granted at the timely request or with the consent of the defendant and the defendant's counsel". Criminal Rule 45(d)(2). In Rhames's case, 14 days were excluded from the Rule 45 calculation very early in the proceedings.

Following Rhames's arrest, but before his case was presented to the Anchorage grand jury, the Public Defender Agency was appointed to represent Rhames and a pre-indictment hearing in Rhames's case was scheduled for September 20, 1988. At the September 20th pre-indictment calendar, when Rhames's case was called, Rhames's attorney asked the district court for a one-week continuance of the pre-indictment hearing. Pursuant to Rhames's request, his hearing was rescheduled for September 27th. The judge presiding over the pre-indictment hearings that day (District Court Judge Elaine M. Andrews) announced that this time would "run against the defendant" for Rule 45 purposes—that is, the 7 days would be excluded from the Rule 45 calculation.

On September 27th, Rhames again requested a week's continuance of the pre-indictment hearing. The district court rescheduled Rhames's pre-indictment hearing for October 4, 1988, and again stated that the time would run "against [the] defense". At the hearing on October 4th, Rhames's attorney and the assistant district attorney informed the court that Rhames had rejected the district attorney's plea offer, and that therefore the State would be presenting Rhames's case to the grand jury. The prosecuting attorney requested a continuance until November 3, 1988 (to allow the case to be presented to the grand jury), with this time to run against the State (that is, the running of the Rule 45 clock would no longer be tolled).

Rhames argues that, even though he requested 14 days of continuance, these days should not be excluded from the Rule 45

---

2. The evidence suggested two possible explanations for Rhames's inability to fire the weapon. Rhames might have loaded his revolver with only five cartridges, and he had already fired all of them. Alternatively, the revolver might have become inoperable: when the revolver was recovered later, it was found to have a bent trigger guard that obstructed the action of the trigger. Although the revolver was obviously operable when Rhames entered the bedroom (since he fired two shots as he came into the room), it is conceivable that the trigger guard was bent by the time Rhames wrestled Patrick to the floor and aimed the weapon at Patrick.

calculation. Rhames points out that pre-indictment hearings occur in district court before a felony defendant has been formally arraigned. The event that is being continued is not the defendant's trial, but rather the preliminary hearing that the district court must hold if a felony defendant is not indicted within the time limits of Criminal Rule 5(e)(4).

We reject Rhames's argument. Both the supreme court and this court have consistently interpreted Rule 45(d)(1) in a literal manner: the running of the Rule 45 clock is tolled by any proceeding involving the defendant, whether or not it results in an ascertainable delay of the defendant's trial. *See State v. Clouatre*, 516 P.2d 1189, 1190–91 (Alaska 1973); *State v. Angaiak*, 847 P.2d 1068, 1072–73 (Alaska App.1993). In particular, the supreme court has held that a continuance of a defendant's preliminary hearing in district court is excluded from the Rule 45 calculation. *See Peterson v. State*, 562 P.2d 1350, 1359 n. 13 (Alaska 1977).

Such a rule makes sense; any continuance of a defendant's pre-indictment hearing clearly delays the procedural progress of the case, since any continuance of the pre-indictment hearing will delay presentation of the defendant's case to the grand jury. Rhames's suggestion that Rule 45 should not be tolled during such continuances is meritless. With these 14 days excluded from the Rule 45 calculation, Rhames was brought to trial within the 120 days allowed by the rule.

■ Moreover, another period of time was tolled under Rule 45 because, in superior court, Rhames requested a continuance of his trial. Rhames was arraigned in superior court on November 4, 1988. At that time, his trial was set for December 19, 1988. One week later, on November 10th, Rhames's attorney filed a motion seeking a continuance of this trial date, requesting a trial in "late January or early February, 1989". Superior Court Judge Joan Woodward granted Rhames's motion to continue the trial (finding good cause because of defense counsel's recent assignment to the case and because the original trial date conflicted with the defense attorney's trial and travel schedules). The judge rescheduled Rhames's trial for January 16, 1989. Under Criminal Rule 45(d)(2), this 28–day continuance is excluded from the Rule 45 calculation.

Rhames asserts that this 28 days should not be excluded because, on November 28, 1988 (18 days after the motion for continuance was filed and just one day before it was granted), Rhames told his attorney that he no longer consented to a continuance of trial. However, Rhames admits that this attorney-client conversation was never reported to the superior court. Because the superior court was never apprised that Rhames no longer consented to a continuance of his trial, the entire period of the requested continuance is excluded from the Rule 45 calculation. *State v. Jeske*, 823 P.2d 6, 10 (Alaska App.1991).

Rhames asks us to overrule *Jeske*. We decline to do so. We note, moreover, that when Rhames told his attorney that he no longer consented to a continuance of trial, the defense motion for a continuance had been pending for 18 days. Thus, even if Rhames's attorney had immediately reported his client's change of heart to the superior court, 18 days would still have been excluded from the Rule 45 calculation—sufficient to reduce the Rule 45 calculation below 120 days. For these reasons, we hold that Rhames was brought to trial within the time limits of Criminal Rule 45.

■ Rhames next asserts that his trial jury should have been instructed on self-defense. Rhames contends that, as he approached Patrick's apartment and looked through the window, it is conceivable that he might have seen Carrie hand her .22 pistol to Patrick, thus leading Rhames to conclude that he might have to defend himself.

■ Rhames's argument overlooks the fact that, under all versions of the events being litigated, Rhames was the initial aggressor. It was Rhames who broke into Patrick's apartment, .38 revolver in hand, knowing that he was violating a restraining order, and intending to assault the two people inside. Even assuming that Rhames saw Patrick holding a weapon, and even assuming that Rhames apprehended some danger from this, self-defense is not available to the initial aggressor in a confrontation. AS

11.81.330(a)(3); *Bangs v. State,* 608 P.2d 1, 5 (Alaska 1980).

Moreover, even if Rhames had not been the initial aggressor, he still would not have been authorized to use deadly force against Patrick and Carrie unless he had no opportunity to safely retreat from the encounter. *See* AS 11.81.335(b). Even assuming that Rhames looked through the window and saw Patrick holding the .22 pistol, the fact remains that Rhames proceeded to break into the apartment. Rhames suggests no reason why he could not have avoided the encounter by simply refraining from breaking into the apartment and, instead, driving away.

Finally, even assuming that Rhames saw Patrick holding the .22 pistol, the evidence unambiguously demonstrates that it was Patrick who was entitled to use deadly force upon Rhames, not vice versa. *See* AS 11.81.350(c)(2) (a property owner may use deadly force when necessary to terminate a burglary). For these reasons, the superior court properly denied Rhames's request for a jury instruction on self-defense.

 Rhames challenges a portion of Carrie Rhames's testimony at his trial. During direct examination, Carrie explained that she had obtained a restraining order against Rhames, that she had telephoned Rhames to inform him of the existence of this restraining order, and that Rhames had replied, "A restraining order doesn't mean anything to me!"

Rhames asserts that this testimony violated the terms of a protective order issued at the beginning of his trial. According to Rhames, this protective order prohibited any mention of restraining orders. Rhames is mistaken. The protective order prohibited the State from introducing evidence of Rhames's past convictions for violating previous restraining orders (unless the State first obtained court approval for this evidence).[3]

There was no order preventing Carrie Rhames from testifying about the restraining order issued on the morning of the episode being litigated.

Rhames's trial attorney in fact made no objection to Carrie Rhames's testimony that she "dialed 911 and told them that my husband ... was after me, and ... told them that I had a restraining order, a domestic violence order". Nor did Rhames's attorney object when Carrie elaborated on her reason for calling Rhames and informing him of the restraining order: "Because he had threatened me, and I wanted to tell him that I had a restraining—another domestic violence order against him, and to just leave me alone."

Rhames's attorney objected only when Carrie started to explain that a restraining order "is when somebody's been aggravating you, threatening you, or beating up on you...." A bench conference ensued. At the end of this conference (which has not been transcribed for appeal), Judge Woodward instructed the jury that restraining orders are entered "*ex parte*—that means, without the other side being present and having an opportunity to say anything".

Following this explanation, Carrie Rhames continued her testimony:

> PROSECUTOR: And when you called Mr. Rhames up, what did you say to him?
>
> CARRIE RHAMES: I just told him that I had a restraining order, and I wanted him to—you know, I wanted to live peaceably with him if I could. That's what I was telling him. I just said, you know, just ... stay away from me, John.
>
> PROSECUTOR: Did he tell you whether he understood what a restraining order was?

---

3. Here is what Rhames's trial attorney requested:
 THE COURT: Anything else we need to take up prior to getting the jurors up here?
 DEFENSE ATTORNEY: ... Mr. Rhames has a variety of—let me just give you some background on what this case is about. Mr. Rhames is charged with ... assault against his ex-wife and a male friend of hers. Mr. Rhames has a number of harassment convic-

tions involving his wife, violation[s] of restraining orders, court orders that were issued, either domestic violence writs or in conjunction with the divorce proceedings[.] ... I would ask [that] the State ... be precluded from making mention of those prior convictions [unless] it comes forward out of the presence of the jury and makes application to the Court.
PROSECUTOR: Agreed.

CARRIE RHAMES: He said, "What restraining order? A restraining order doesn't mean anything to me."

Rhames's attorney made no objection to this testimony.

Thus, the trial record indicates that Rhames never objected to Carrie's testimony concerning the existence of the September 1988 restraining order or Rhames's reaction when he found out about it. Rather, the objection was to evidence of Rhames's prior acts of violence or harassment that had led the court to issue restraining orders against Rhames or, in prior criminal litigation, to find that Rhames had violated earlier restraining orders.

Because no objection was raised at trial to Carrie Rhames's testimony concerning the existence of the restraining order, Rhames must now show that admission of this testimony was plain error. It was not.

Under Alaska Evidence Rule 404(b), admission of evidence of prior bad acts rests on the trial judge's balancing of the probative value of the evidence against its potential for unfair prejudice. Concededly, testimony concerning the restraining order carried some potential for unfair prejudice, because the existence of the restraining order might be construed as an indication that Rhames had done something wrong in the past to justify the issuance of the order. To rebut this inference, Judge Woodward explained to the jury that restraining orders are generally issued *ex parte*, so that Rhames did not have the opportunity to present his side of the story. Moreover, the probative force of this evidence was great. The verdicts in this case turned on the jury's evaluation of Rhames's mental state (his intent). Thus, evidence of Rhames's knowledge of and reaction to the restraining order was obviously relevant and important. Even if there had been a timely objection to Carrie Rhames's testimony, Judge Woodward's decision to admit the testimony would have been well within her discretion under Rule 404(b). We find no plain error.

■ Rhames argues that his trial jury was misinstructed on the definition of "dangerous instrument". Rhames was charged with sec-

ond-degree assault for using his revolver as a bludgeon to strike Charles Patrick in the head as Rhames was making his escape from the apartment. To find Rhames guilty of second-degree assault, the jury was required to find that Rhames, acting with intent to cause physical injury, caused physical injury to Patrick "by means of a dangerous instrument". *See* AS 11.41.210(a)(1).

Rhames asserts that, by the time he struck Patrick with his revolver, the revolver was no longer operable, and thus the revolver could not be considered a "dangerous instrument" unless Rhames used it to bludgeon Patrick in a manner capable of inflicting death or serious physical injury. Rhames contends that the jury needed to have this point of law explicitly explained to them. Instead, Judge Woodward instructed the jury that any firearm, whether or not operable, was a "dangerous weapon". This, Rhames asserts, was error.

Rhames's trial attorney did not object to this jury instruction. Rhames must therefore demonstrate that the "dangerous instrument" instruction contained plain error—an error that would have been apparent to any competent judge or attorney. *Massey v. State*, 771 P.2d 448, 453 (Alaska App.1989). In fact, as we explain below, there was no error in this instruction.

Rhames cites *Else v. State*, 555 P.2d 1210, 1212 (Alaska 1976), for the proposition that "an unloaded pistol is not a dangerous weapon within the meaning of the assault with a dangerous weapon statute[,] [at least] when there is no present ability to use it as a bludgeon". Rhames asserts that this same rule should apply when a pistol is inoperable. However, *Else* was a decision construing a statute in Alaska's former criminal code. Since 1980, Alaska has been operating under a new criminal code, and that code expressly provides that firearms remain "dangerous instruments" even when they are unloaded or inoperable.

The legislature has defined "dangerous instrument" as including "any deadly weapon". AS 11.81.900(b)(11). The legislature has defined "deadly weapon" as including "any firearm". AS 11.81.900(b)(13). And, in AS

11.81.900(b)(22), the legislature has defined "firearm" to mean:

a weapon, including a pistol, revolver, rifle, or shotgun, whether loaded or unloaded, operable or inoperable, designed for discharging a shot capable of causing death or serious physical injury[.]

The legislature did not act inadvertently when it included inoperable firearms within the definition of "dangerous instrument". Rather, the legislature expressly amended the definitions of "dangerous instrument" and "firearm" in 1980 to make it clear that inoperable firearms were to be classified as "dangerous instruments".

In section 29, chapter 102 SLA 1980, the legislature amended the definition of "dangerous instrument" by revising the reference to "deadly weapons":

"dangerous instrument" means <u>any deadly weapon or</u> anything which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is capable of causing death or serious physical injury; "dangerous instrument" includes "deadly weapon";

(Underlined text indicates an addition, struck-through text a deletion.) The commentary to this amendment declares that the amendment was "required in order to make it specifically clear that all 'deadly weapons' ... are 'dangerous instruments' ". 1980 Senate Journal, Supp. No. 44 (May 29), p. 19.

In section 31 of the same session law, the legislature repealed the pre-existing definition of "firearm", replacing it with the current definition quoted above. The previous definition did not mention inoperable firearms,[4] but the current definition expressly includes them.

In its commentary to this revised definition of "firearm", the legislature declared that its major purpose was to include inoperable firearms within the definition:

*Definition of "Firearm":* This amendment is included to correct a potential drafting oversight and clarif[y] that an inoperable firearm is included within the definition of firearm. While it [could be argued] that inoperable firearms are already included within paragraph (B) of the current definition of firearm ("any weapon ... *designed* for discharging a shot capable of causing death or serious physical injury"), it is preferable to specifically state that inoperable firearms are included[.]

1980 Senate Journal, Supp. No. 44 (May 29), pp. 20–21 (italics in the original).

Given this legislative history, it is clear that the legislature intended for inoperable firearms to be classified as "dangerous instruments". Judge Woodward's instruction on this issue correctly stated the law. If Rhames believes that inoperable firearms should not be classified as dangerous instruments, he must make his argument to the legislature.

■ Rhames next contends that Judge Woodward committed error when she responded to a note sent by the jury during its deliberations. In their note, the jurors referred to a firearms examiner who had testified during trial; the jurors asked Judge Woodward to have the firearms examiner check the empty .38 shell casings recovered from Rhames's revolver to see if any of these casings bore marks indicating that they had been struck more than once by the hammer.

The prosecutor suggested that the jury be told simply "that the evidence is closed", that the jurors "must decide [this case] on the evidence they have heard", and that "witnesses can not be called at this point". Rhames's attorney agreed with this language, but he also requested that the court's response specifically refer the jurors "to the ... the 'reasonable doubt' and 'lack of evidence' instruction".[5]

4. The initial definition of "firearm" enacted in 1978 read:

"firearm" means
(A) a loaded or unloaded pistol, revolver, rifle, or shotgun; or
(B) any weapon, whether loaded or unloaded, designed for discharging a shot capable of causing death or serious physical injury.

5. This is the instruction that the defense attorney was referring to:

This last-mentioned requirement, that you be satisfied beyond a reasonable doubt of [the] defendant's guilt, is what is called the burden of proof. It is not required that the prosecution prove guilt beyond all possible doubt, for it is rarely possible to prove anything to an

Judge Woodward decided that if the court directed the jury's attention to the reasonable doubt instruction in this context, the jurors might wrongly infer that the judge believed that the absence of the requested evidence might, by itself, constitute sufficient reasonable doubt to require Rhames's acquittal. The judge therefore responded to the jury note as follows: "The evidence in the case is closed. Witnesses cannot be recalled at this point."

Rhames contends that Judge Woodward should have directed the jurors' attention to the instruction on reasonable doubt and the government's burden of proof because "the jury request for additional evidence betray[ed] a serious lack of understanding of these important concepts". The record does not support Rhames's contention. The jury note reflects the jurors' interest in obtaining additional evidence, but it does not suggest that the jurors were confused about any legal issue. Judge Woodward did not abuse her discretion when she declined to draw the jurors' attention to the instruction on reasonable doubt and the State's burden of proof. *DeGross v. State*, 768 P.2d 134, 136 (Alaska App.1989).

■ Finally, Rhames argues that the State presented insufficient evidence to sustain his attempted murder conviction. Rhames's argument depends on viewing the evidence in the light most favorable to himself. We, however, must view the evidence in the light most favorable to upholding the jury's verdict. *Simpson v. State*, 877 P.2d 1319, 1320 (Alaska App.1994). Viewed in this light, the evidence is clearly sufficient to uphold Rhames's conviction for attempted murder.

The judgement of the superior court is AFFIRMED.

absolute certainty. Rather, the test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense— the kind of doubt that would make a reasonable person hesitate to act in his or her important affairs.